312 F.3d 1052
 Sean SILVEIRA; Jack Safford; Patrick Overstreet; David K. Mehl; Steven Focht, Sgt.; David Blalock, Sgt.; Marcus Davis; Vance Boyce; Keneth Dewald, Plaintiffs-Appellants,
v.
Bill LOCKYER, Attorney General, State of California; Gray Davis, Governor, State of California, Defendants-Appellees.
 No. 01-15098.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 15, 2002.
 Filed December 5, 2002.
 As Amended January 27, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Gary W. Gorski, Fair Oaks, CA, for the plaintiffs-appellants.
 Nancy Palmieri, Deputy Attorney General, Office of the Attorney General, San Diego, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California; William B. Shubb, District Judge, Presiding. D.C. No. CV-00-00411-WBS.
 Before: REINHARDT, MAGILL,* and FISHER, Circuit Judges.
 Opinion by Judge REINHARDT; Concurrence by Judge MAGILL.
 REINHARDT, Circuit Judge.
 
 
 1
 In 1999, the State of California enacted amendments to its gun control laws that significantly strengthened the state's restrictions on the possession, use, and transfer of the semi-automatic weapons popularly known as "assault weapons." Plaintiffs, California residents who either own assault weapons, seek to acquire such weapons, or both, brought this challenge to the gun control statute, asserting that the law, as amended, violates the Second Amendment, the Equal Protection Clause, and a host of other constitutional provisions. The district court dismissed all of the plaintiffs' claims. Because the Second Amendment does not confer an individual right to own or possess arms, we affirm the dismissal of all claims brought pursuant to that constitutional provision. As to the Equal Protection claims, we conclude that there is no constitutional infirmity in the statute's provisions regarding active peace officers. We find, however, no rational basis for the establishment of a statutory exception with respect to retired peace officers, and hold that the retired officers' exception fails even the most deferential level of scrutiny under the Equal Protection Clause. Finally, we conclude that each of the three additional constitutional claims asserted by plaintiffs on appeal is without merit.
 
 I. INTRODUCTION
 
 2
 In response to a proliferation of shootings involving semi-automatic weapons, the California Legislature passed the Roberti-Roos Assault Weapons Control Act ("the AWCA") in 1989. See 1989 Cal. Stat. ch. 19, § 3, at 64, codified at CAL. PENAL CODE § 12275 et seq. The immediate cause of the AWCA's enactment was a random shooting earlier that year at the Cleveland Elementary School in Stockton, California. An individual armed with an AK-47 semi-automatic weapon opened fire on the schoolyard, where three hundred pupils were enjoying their morning recess. Five children aged 6 to 9 were killed, and one teacher and 29 children were wounded. Kasler v. Lockyer, 23 Cal.4th 472, 97 Cal. Rptr.2d 334, 2 P.3d 581, 587 (2000).
 
 
 3
 The California Assembly met soon thereafter in an extraordinary session called for the purpose of enacting a response to the Stockton shooting. 1 CAL. ASSEMBLY J., at 436-37 (Feb. 13, 1989). The legislation that followed, the AWCA, was the first legislative restriction on assault weapons in the nation, and was the model for a similar federal statute enacted in 1994. Public Safety and Firearms Use Protection Act, Pub.L. No. 103-322, 108 Stat. 1996 (codified at 18 U.S.C. §§ 921 et seq.). The AWCA renders it a felony offense to manufacture in California any of the semi-automatic weapons specified in the statute, or to possess, sell, transfer, or import into the state such weapons without a permit. CAL. PENAL CODE § 12280.[1] The statute contains a grandfather clause that permits the ownership of assault weapons by individuals who lawfully purchased them before the statute's enactment, so long as the owners register the weapons with the state Department of Justice. Id.[2] The grandfather clause, however, imposes significant restrictions on the use of weapons that are registered pursuant to its provisions. Id. § 12285(c).[3] Approximately forty models of firearms are listed in the statute as subject to its restrictions. The specified weapons include "civilian" models of military weapons that feature slightly less firepower than the military-issue versions, such as the Uzi, an Israeli-made military rifle; the AR-15, a semi-automatic version of the United States military's standard-issue machine gun, the M-16; and the AK-47, a Russian-designed and Chinese-produced military rifle. The AWCA also includes a mechanism for the Attorney General to seek a judicial declaration in certain California Superior Courts that weapons identical to the listed firearms are also subject to the statutory restrictions. § 12276.5(a)(1)-(2).[4]
 
 
 4
 The AWCA includes a provision that codifies the legislative findings and expresses the legislature's reasons for passing the law:
 
 
 5
 The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in [the statute] based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings. It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities.
 
 
 6
 Id. § 12275.5.
 
 
 7
 In 1999, the legislature amended the AWCA in order to broaden its coverage and to render it more flexible in response to technological developments in the manufacture of semi-automatic weapons. The amended AWCA retains both the original list of models of restricted weapons, and the judicial declaration procedure by which models may be added to the list. The 1999 amendments to the AWCA statute add a third method of defining the class of restricted weapons: The amendments provide that a weapon constitutes a restricted assault weapon if it possesses certain generic characteristics listed in the statute. Id. § 12276.1.[5] Examples of the types of weapons restricted by the revised AWCA include a "semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds," § 12276.1(a)(2), and a semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and also features a flash suppressor, a grenade launcher, or a flare launcher. § 12276.1(a)(1)(A)-(E). The amended AWCA also restricts assault weapons equipped with "barrel shrouds," which protect the user's hands from the intense heat created by the rapid firing of the weapon, as well as semiautomatic weapons equipped with silencers. Id.
 
 
 8
 As originally enacted, the AWCA authorized specified law enforcement agencies to purchase and possess assault weapons, and permitted individual sworn members of those agencies to possess and use the weapons in the course of their official duties.[6] Two additional provisions relating to peace officers were added by the 1999 amendments. First, the legislature provided that the peace officers permitted to possess and use assault weapons in the discharge of their official duties were permitted to do so "for law enforcement purposes, whether on or off duty." § 12280(g). Second, the amendments added an exception for retired peace officers. The exception provides that "the sale or transfer of assault weapons by an entity [listed in note 6, supra,] to a person, upon retirement, who retired as a sworn officer from that entity" is permissible, and that the general restrictions on possession and use of assault weapons do not apply to a retired peace officer who receives the weapon upon retirement from his official duties. § 12280(h)-(i). In sum, then, the statute as amended may fairly be characterized as constituting a ban on the possession of assault weapons by private individuals; with a grandfather clause permitting the retention of previously-owned weapons by their purchasers, provided the owners register them with the state; and with a statutory exception allowing the possession of assault weapons by retired peace officers who acquire them from their employers at the time of their retirement.
 
 
 9
 Plaintiffs in this case are nine individuals, some of whom lawfully acquired weapons that were subsequently classified as assault weapons under the amended AWCA.[7] They filed this action in February, 2000, one month after the 1999 AWCA amendments took effect. Plaintiffs who own assault weapons challenge the AWCA requirements that they either register, relinquish, or render inoperable their assault weapons as violative of their Second Amendment rights. Plaintiffs who seek to purchase weapons that may no longer lawfully be purchased in California also attack the ban on assault weapon sales as being contrary to their rights under that Amendment. Additionally, plaintiffs who are not active or retired California peace officers challenge on Fourteenth Amendment Equal Protection grounds two provisions of the AWCA: one that allows active peace officers to possess assault weapons while off-duty, and one that permits retired peace officers to possess assault weapons they acquire from their department at the time of their retirement. The State of California immediately moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that all the claims were barred as a matter of law. After a hearing, the district judge granted the defendants' motion in all respects, and dismissed the case. Plaintiffs appeal, and we affirm on all claims but one.
 
 II. DISCUSSION
 
 10
 A. Background and Precedent.
 
 
 11
 A robust constitutional debate is currently taking place in this nation regarding the scope of the Second Amendment, a debate that has gained intensity over the last several years. Until recently, this relatively obscure constitutional provision attracted little judicial or scholarly attention. As a result, however, of increasing popular concern over gun violence, the passage of legislation restricting the sale and use of firearms, the cultural significance of firearms in American society, and the political activities of pro-gun enthusiasts under the leadership of the National Rifle Association (the NRA), the disagreement over the meaning of the Second Amendment has grown particularly heated.
 
 
 12
 There are three principal schools of thought that form the basis for the debate. The first, which we will refer to as the "traditional individual rights" model, holds that the Second Amendment guarantees to individual private citizens a fundamental right to possess and use firearms for any purpose at all, subject only to limited government regulation. This view, urged by the NRA and other firearms enthusiasts, as well as by a prolific cadre of fervent supporters in the legal academy, had never been adopted by any court until the recent Fifth Circuit decision in United States v. Emerson, 270 F.3d 203, 227 (5th Cir.2001), cert. denied, ___ U.S. ___, 122 S.Ct. 2362, 153 L.Ed.2d 184 (2002). The second view, a variant of the first, we will refer to as the "limited individual rights" model. Under that view, individuals maintain a constitutional right to possess firearms insofar as such possession bears a reasonable relationship to militia service.[8] The third, a wholly contrary view, commonly called the "collective rights" model, asserts that the Second Amendment right to "bear arms" guarantees the right of the people to maintain effective state militias, but does not provide any type of individual right to own or possess weapons. Under this theory of the amendment, the federal and state governments have the full authority to enact prohibitions and restrictions on the use and possession of firearms, subject only to generally applicable constitutional constraints, such as due process, equal protection, and the like. Long the dominant view of the Second Amendment, and widely accepted by the federal courts, the collective rights model has recently come under strong criticism from individual rights advocates. After conducting a full analysis of the amendment, its history, and its purpose, we reaffirm our conclusion in Hickman v. Block, 81 F.3d 98 (9th Cir.1996), that it is this collective rights model which provides the best interpretation of the Second Amendment.
 
 
 13
 Despite the increased attention by commentators and political interest groups to the question of what exactly the Second Amendment protects, with the sole exception of the Fifth Circuit's Emerson decision there exists no thorough judicial examination of the amendment's meaning. The Supreme Court's most extensive treatment of the amendment is a somewhat cryptic discussion in United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). In that case, a criminal defendant brought a Second Amendment challenge to a federal gun control law that prohibited the transport of sawed-off shotguns in interstate commerce. The Court rejected the challenge to the statute. In the only and oft-quoted passage in the United States Reports to consider, albeit somewhat indirectly, whether the Second Amendment establishes an individual right to arms, the Miller Court concluded:
 
 
 14
 In the absence of any evidence tending to show that possession or use of a `shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.
 
 
 15
 Miller, 307 U.S. at 178, 59 S.Ct. 816. The Miller Court also observed more generally that "[w]ith the obvious purpose to assure the continuation and render possible the effectiveness of [state militias] the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view." Id. Thus, in Miller the Supreme Court decided that because a weapon was not suitable for use in the militia, its possession was not protected by the Second Amendment. As a result of its phrasing of its holding in the negative, however, the Miller Court's opinion stands only for the proposition that the possession of certain weapons is not protected, and offers little guidance as to what rights the Second Amendment does protect. Accordingly, it has been noted, with good reason, that "[t]he Supreme Court's jurisprudence on the scope of [the Second] [A]mendment is quite limited, and not entirely illuminating." Gillespie v. City of Indianapolis, 185 F.3d 693, 710 (7th Cir.1999). What Miller does strongly imply, however, is that the Supreme Court rejects the traditional individual rights view.
 
 
 16
 The only post-Miller reference by the Supreme Court to the scope of the amendment occurred in Lewis v. United States, 445 U.S. 55, 65 n. 8, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), in which the Court noted, in a footnote dismissing a Second Amendment challenge to a felon-in-possession conviction, that the federal gun control laws at issue did not "trench upon any constitutionally protected liberties," citing Miller in support of this observation. In that footnote, Lewis characterized the Miller holding as follows: "[T]he Second Amendment guarantees no right to keep and bear a firearm that does not have `some reasonable relationship to the preservation or efficiency of a well-regulated militia.'" Id. (quoting Miller, 307 U.S. at 178, 59 S.Ct. 816). The Lewis Court, like the Miller Court, phrased its statements in terms of what is not protected. Lewis does, however, reinforce the strong implication in Miller that the Court rejects the traditional individual rights model.
 
 
 17
 Some thirty-odd years after Miller, two Justices of the Court pithily expressed their views on the question whether the Second Amendment limits the power of the federal or state governments to enact gun control laws. Justice Douglas, joined by Justice Thurgood Marshall, stated in dissent in Adams v. Williams, that in his view, the problem of police fearing that suspects they apprehend are armed:
 
 
 18
 is an acute one not because of the Fourth Amendment, but because of the ease with which anyone can acquire a pistol. A powerful lobby dins into the ears of our citizenry that these gun purchases are constitutional rights protected by the Second Amendment.... There is under our decisions no reason why stiff state laws governing the purchase and possession of pistols may not be enacted. There is no reason why pistols may not be barred from anyone with a police record. There is no reason why a State may not require a purchaser of a pistol to pass a psychiatric test. There is no reason why all pistols should not be barred to everyone except the police.
 
 
 19
 407 U.S. 143, 150, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (Douglas, J., dissenting). In short, in Adams two then-sitting Justices made it clear that they believed that the Second Amendment did not afford an individual right — traditional, limited, or otherwise — to own or possess guns.
 
 
 20
 We also note that two of the Supreme Court's recent decisions that limit the power of the federal government to regulate activities of the states relate to firearms restrictions. See Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (holding that a federal requirement that state officers perform background checks on gun purchasers violates the anti-commandeering principle of the Tenth Amendment); United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (holding that Congress exceeded its authority under the Commerce Clause by enacting the Gun-Free School Zones Act). In neither case did the Court address a Second Amendment issue directly; however, in each case a currently-sitting Justice expressed his individual view of the amendment's scope, directly or indirectly, but from radically different standpoints. In his dissent in Lopez, Justice Stevens, although not mentioning the Second Amendment, strongly implied that he believes that it offers no obstacles to the federal government's ability to regulate firearms:
 
 
 21
 Guns are both articles of commerce and articles that can be used to restrain commerce. Their possession is the consequence, either directly or indirectly, of commercial activity. In my judgment, Congress' power to regulate commerce in firearms includes the power to prohibit possession of guns at any location because of their potentially harmful use....
 
 
 22
 514 U.S. at 602-03, 115 S.Ct. 1624 (Stevens, J., dissenting). Justice Thomas spoke to the Second Amendment issue more directly in his concurrence in Printz, in words that suggested that he may well support the traditional individual rights view:
 
 
 23
 This Court has not had recent occasion to consider the nature of the substantive right safeguarded by the Second Amendment. If, however, the Second Amendment is read to confer a personal right to "keep and bear arms," a colorable argument exists that the Federal Government's regulatory scheme, at least as it pertains to the purely intrastate sale or possession of firearms, runs afoul of that Amendment's protections. As the parties did not raise this argument, however, we need not consider it here. Perhaps, at some future date, this Court will have the opportunity to determine whether Justice Story was correct when he wrote that the right to bear arms "has justly been considered, as the palladium of the liberties of a republic." 3 J. Story, Commentaries § 1890, p. 746 (1833).
 
 
 24
 521 U.S. at 938-39, 117 S.Ct. 2365 (Thomas, J., concurring) (emphasis in original).[9]
 
 
 25
 Finally, we note that, after his retirement, Chief Justice Warren Burger uttered one of the most widely publicized comments about the Second Amendment ever made by a Justice inside or outside the context of a judicial opinion. In an interview, former Chief Justice Burger stated that the traditional individual rights view was:
 
 
 26
 one of the greatest pieces of fraud, I repeat the word `fraud,' on the American public by special interest groups that I've ever seen in my lifetime. The real purpose of the Second Amendment was to ensure that state armies — the militia — would be maintained for the defense of the state. The very language of the Second Amendment refutes any argument that it was intended to guarantee every citizen an unfettered right to any kind of weapon he or she desires.
 
 
 27
 Warren E. Burger, The Right to Bear Arms, PARADE MAGAZINE, Jan. 14, 1990, at 4. Although we in no way share Chief Justice Burger's view that Second Amendment enthusiasts are guilty of fraud, we do generally agree with his statements regarding the Amendment's purpose and scope.
 
 
 28
 Our court, like every other federal court of appeals to reach the issue except for the Fifth Circuit, has interpreted Miller as rejecting the traditional individual rights view. In Hickman v. Block, we held that "the Second Amendment guarantees a collective rather than an individual right." 81 F.3d at 102 (citation and quotation marks omitted).[10] Like the other courts, we reached our conclusion regarding the Second Amendment's scope largely on the basis of the rather cursory discussion in Miller, and touched only briefly on the merits of the debate over the force of the amendment. See id.[11]
 
 
 29
 Appellants contend that we misread Miller in Hickman.[12] They point out that, as we have already noted, Miller, like most other cases that address the Second Amendment, fails to provide much reasoning in support of its conclusion. We agree that our determination in Hickman that Miller endorsed the collective rights position is open to serious debate. We also agree that the entire subject of the meaning of the Second Amendment deserves more consideration than we, or the Supreme Court, have thus far been able (or willing) to give it. This is particularly so because, since Hickman was decided, there have been a number of important developments with respect to the interpretation of the highly controversial provision: First, as we have noted, there is the recent Emerson decision in which the Fifth Circuit, after analyzing the opinion at length, concluded that the Supreme Court's decision in Miller does not resolve the issue of the Amendment's meaning. The Emerson court then canvassed the pertinent scholarship and historical materials, and held that the Second Amendment does establish an individual right to possess arms — the first federal court of appeals ever to have so decided.[13] Second, the current leadership of the United States Department of Justice recently reversed the decades-old position of the government on the Second Amendment, and adopted the view of the Fifth Circuit. Now, for the first time, the United States government contends that the Second Amendment establishes an individual right to possess arms.[14] The Solicitor General has advised the Supreme Court that "[t]he current position of the United States ... is that the Second Amendment more broadly protects the rights of individuals, including persons who are not members of any militia or engaged in active military service or training, to possess and bear their own firearms, subject to reasonable restrictions...." Opposition to Petition for Certiorari in United States v. Emerson, No. 01-8780, at 19 n. 3. In doing so, the Solicitor General transmitted to the Court a memorandum from Attorney General John Ashcroft to all United States Attorneys adopting the Fifth Circuit's view and emphasizing that the Emerson court "undertook a scholarly and comprehensive review of the pertinent legal materials ...," although the Attorney General was as vague as the Fifth Circuit with respect both to the types of weapons that he believes to be protected by the Second Amendment, and the basis for making such determinations. Id., app. A.
 
 
 30
 The reversal of position by the Justice Department has caused some turmoil in the lower courts, and has led to a number of challenges to federal statutes relating to weapons sales, transport, and possession, including a heavy volume in the district courts of this circuit. See, e.g., United States v. Stepney, No. 01-0344, 2002 WL 1460258 (N.D.Cal. July 1, 2002); Jason Hoppin, No Free Ride For Gun Argument, THE RECORDER, July 25, 2002 (discussing Second Amendment defenses raised by criminal defendants in Northern District of California cases). Similar Second Amendment defenses have been raised by criminal defendants throughout the nation as a result of the Justice Department's new position on the amendment. See Adam Liptak, Revised View of Second Amendment Is Cited As Defense in Gun Cases, N.Y. TIMES, July 23, 2002, at A1.
 
 
 31
 Given the dearth of both reasoned and definitive judicial authority, a particularly active academic debate has developed over the scope of the Second Amendment. Compare, e.g. Eugene Volokh, The Commonplace Second Amendment, 73 N.Y.U. L. REV. 793 (1998) (advocating individual rights view) and Sanford Levinson, The Embarrassing Second Amendment, 99 YALE L.J. 637 (1989) (same) with Michael C. Dorf, What Does the Second Amendment Mean Today?, 76 CHI.-KENT L. REV. 291, 294 (2000) (advocating collective rights view); Jack N. Rakove, The Second Amendment: The Highest Stage of Originalism, 76 CHI.-KENT L. REV. 103, 124 (2000) (same); and David Yassky, The Second Amendment: Structure, History and Constitutional Change, 99 MICH. L. REV. 588 (2000) (same). As a result of the renewed interest in the issue, the Second Amendment has been the subject of a number of scholarly symposia. See, e.g., The Second Amendment: Fresh Looks, 76 CHI.-K ENT L. REV. 3-715 (2000); Second Amendment Symposium, 1998 B.Y.U. L. REV. 1-336; A Second Amendment Symposium Issue, 62 TENN. L. REV. 443-821 (1995). Indeed, Second Amendment scholarship has become so active that the scholarship itself has become the subject of study. See Robert J. Spitzer, Lost and Found: Researching the Second Amendment, 76 CHI.-KENT L. REV. 349 (2000).
 
 
 32
 In light of the United States government's recent change in position on the meaning of the amendment, the resultant flood of Second Amendment challenges in the district courts, the Fifth Circuit's extensive study and analysis of the amendment and its conclusion that Miller does not mean what we and other courts have assumed it to mean, the proliferation of gun control statutes both state and federal, and the active scholarly debate that is being waged across this nation, we believe it prudent to explore Appellants' Second Amendment arguments in some depth, and to address the merits of the issue, even though this circuit's position on the scope and effect of the amendment was established in Hickman. Having engaged in that exploration, we determine that the conclusion we reached in Hickman was correct.[15]
 
 
 33
 B. Appellants Lack Standing to Challenge the Assault Weapons Control Act on Second Amendment Grounds.
 
 
 34
 Appellants contend that the California Assault Weapons Control Act and its 1999 revisions violate their Second Amendment rights. We unequivocally reject this contention. We conclude that although the text and structure of the amendment, standing alone, do not conclusively resolve the question of its meaning, when we give the text its most plausible reading and consider the amendment in light of the historical context and circumstances surrounding its enactment we are compelled to reaffirm the collective rights view we adopted in Hickman: The amendment protects the people's right to maintain an effective state militia, and does not establish an individual right to own or possess firearms for personal or other use. This conclusion is reinforced in part by Miller's implicit rejection of the traditional individual rights position.[16] Because we hold that the Second Amendment does not provide an individual right to own or possess guns or other firearms,[17] plaintiffs lack standing to challenge the AWCA.[18]
 
 
 35
 1. The Text and Structure of the Second Amendment Demonstrate that the Amendment's Purpose is to Preserve Effective State Militias; That Purpose Helps Shape the Content of the Amendment.
 
 
 36
 The Second Amendment states in its entirety: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. As commentators on all sides of the debate regarding the amendment's meaning have acknowledged, the language of the amendment alone does not conclusively resolve the question of its scope. Indeed, the Second Amendment's text has been called "puzzling,"[19] "an enigma,"[20] and "baffling"[21] by scholars of varying ideological persuasions.[22] What renders the language and structure of the amendment particularly striking is the existence of a prefatory clause, a syntactical device that is absent from all other provisions of the Constitution, including the nine other provisions of the Bill of Rights.[23] Our analysis thus must address not only the meaning of each of the two clauses of the amendment but the unique relationship that exists between them.
 
 
 37
 
 a. The Meaning of the Amendment's First Clause: "A Well Regulated Militia Being Necessary to the Security of A Free State."
 
 
 
 38
 The first or prefatory clause of the Second Amendment sets forth the amendment's purpose and intent. An important aspect of ascertaining that purpose and intent is determining the import of the term "militia." Many advocates of the traditional individual rights model, including the Fifth Circuit, have taken the position that the term "militia" was meant to refer to all citizens, and, therefore, that the first clause simply restates the second in more specific terms. See Emerson, 270 F.3d at 235 ("Militia ... was understood to be composed of the people generally possessed of arms which they knew how to use, rather than to refer to some formal military group separate and distinct from the people at large."). Relying on their definition of "militia," they conclude that the prefatory clause was intended simply to reinforce the grant of an individual right that they assert is made by the second clause. See id. at 236.[24] We agree with the Fifth Circuit in a very limited respect. We agree that the interpretation of the first clause and the extent to which that clause shapes the content of the second depends in large part on the meaning of the term "militia." If militia refers, as the Fifth Circuit suggests, to all persons in a state, rather than to the state military entity, the first clause would have one meaning — a meaning that would support the concept of traditional individual rights. If the term refers instead, as we believe, to the entity ordinarily identified by that designation, the state-created and -organized military force, it would likely be necessary to attribute a considerably different meaning to the first clause of the Second Amendment and ultimately to the amendment as a whole.
 
 
 39
 We believe the answer to the definitional question is the one that most persons would expect: "militia" refers to a state military force. We reach our conclusion not only because that is the ordinary meaning of the word, but because contemporaneously enacted provisions of the Constitution that contain the word "militia" consistently use the term to refer to a state military entity, not to the people of the state as a whole. We look to such contemporaneously enacted provisions for an understanding of words used in the Second Amendment in part because this is an interpretive principle recently explicated by the Supreme Court in a case involving another word that appears in that amendment — the word "people."[25] That same interpretive principle is unquestionably applicable when we construe the word "militia."
 
 
 40
 "Militia" appears repeatedly in the first and second Articles of the Constitution. From its use in those sections, it is apparent that the drafters were referring in the Constitution to the second of two government-established and -controlled military forces. Those forces were, first, the national army and navy, which were subject to civilian control shared by the president and Congress,[26] and, second, the state militias, which were to be "essentially organized and under control of the states, but subject to regulation by Congress and to `federalization' at the command of the president." Paul Finkelman, "A Well Regulated Militia": The Second Amendment in Historical Perspective, 76 CHI.-KENT L. REV. 195, 204 (2000).
 
 
 41
 Article I also provides that the militia, which is essentially a state military entity, may on occasion be federalized; Congress may "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. CONST. art. I, § 8, cl. 15. The fact that the militias may be "called forth" by the federal government only in appropriate circumstances underscores their status as state institutions. Article II also demonstrates that the militia were conceived of as state military entities; it provides that the President is to be "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." Id. art. II, § 2, cl. 1 (emphasis added). Like the Second Amendment, not all of the provisions in Articles I and II refer specifically to the militia as "the state militia." Nevertheless, the contexts in which the term is used demonstrate that even without the prefatory word, "militia" refers to state military organizations and not to their members or potential members throughout these two Articles.
 
 
 42
 Our conclusion that "militia" refers to a state entity, a state fighting force, is also supported by the use of that term in another of the provisions of the Bill of Rights. The Fifth Amendment, enacted by the First Congress at the same time as the Second Amendment, provides that a criminal defendant has a right to an indictment or a presentment "except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger...." U.S. CONST. amend. V. The inclusion of separate references to the "land or naval forces" and "the Militia," both of which may be in "actual service" to the nation's defense, indicates that the framers conceived of two formal military forces that would be active in times of war-one being the national army and navy, and the other the federalized state militia. Certainly, the use of "militia" in this provision of the Bill of Rights is most reasonably understood as referring to a state entity, and not to the collection of individuals who may participate in it.
 
 
 43
 Not only did the drafters of the Constitution use "militia" to refer to state military entities, so too did the drafters of the Constitution's predecessor document, the Articles of Confederation. The Articles provided that "every state shall always keep up a well regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition and camp equipage." THE ARTICLES OF CONFEDERATION art. 6 (1777), in DOCUMENTS OF AMERICAN HISTORY 112 (Henry Steele Commager ed., 7th ed.1963). The "well regulated and disciplined militia[s]" described by the Articles of Confederation were quite clearly those institutions established by the individual states. Thus, the prevailing understanding both before and at the time of the adoption of the Constitution was that a "militia" constituted a state military force to which the able—bodied male citizens of the various states might be called to service.
 
 
 44
 To determine that "militia" in the Second Amendment is something different from the state entity referred to whenever that word is employed in the rest of the Constitution would be to apply contradictory interpretive methods to words in the same provision. The interpretation urged by those advocating the traditional individual rights view would conflict directly with Verdugo-Urquidez. If the term "the people" in the latter half of the Second Amendment must have the same meaning throughout the Constitution, so too must the phrase "militia."[27]
 
 
 45
 Our reading of the term "militia" as referring to a state military force is also supported by the fact that in the amendment's first clause the militia is described as "necessary to the security of a free State." This choice of language was far from accidental: Madison's first draft of the amendment stated that a well-regulated militia was "the best security of a free country." Anti-Federalist Elbridge Gerry explained that changing the language to "necessary to the security of a free State" emphasized the primacy of the state militia over the federal standing army: "A well-regulated militia being the best security of a free state, admitted an idea that a standing army was a secondary one." Yassky, supra, at 610 (quoting THE CONGRESSIONAL REGISTER, August 17, 1789). In any event, as we will explain infra at 1072, 1078-79, 1083-84, it is clear that the drafters believed the militia that provides the best security for a free state to be the permanent state militia, not some amorphous body of the people as a whole, or whatever random and informal collection of armed individuals may from time to time appear on the scene for one purpose or another.
 
 
 46
 Finally, our definition of "militia" is supported by the inclusion of the modifier "well regulated." As an historian of the Founding Era has noted, the inclusion of that phrase "further shows that the Amendment does not apply to just anyone." Finkelman, supra, at 234. The Second Amendment was enacted soon after the August 1786-February 1787 uprising of farmers in Western Massachusetts known as Shays's Rebellion. What the drafters of the amendment thought "necessary to the security of a free State" was not an "unregulated" mob of armed individuals such as Shays's band of farmers, the modern-day privately organized Michigan Militia, the type of extremist "militia" associated with Timothy McVeigh and other militants with similar anti-government views, groups of white supremacists or other racial or religious bigots, or indeed any other private collection of individuals. To the contrary, "well regulated" confirms that "militia" can only reasonably be construed as referring to a military force established and controlled by a governmental entity.
 
 
 47
 After examining each of the significant words or phrases in the Second Amendment's first clause, we conclude that the clause declares the importance of state militias to the security of the various free states within the confines of their newly structured constitutional relationship. With that understanding, the reason for and purpose of the Second Amendment becomes clearer.
 
 
 48
 
 b. The Meaning of the Amendment's Second Clause: "The Right of the People to Keep and Bear Arms, Shall Not Be Infringed."
 
 
 
 49
 Having determined that the first clause of the Second Amendment declares the importance of state militias to the proper functioning of the new constitutional system, we now turn to the meaning of the second clause, the effect the first clause has on the second, and the meaning of the amendment as a whole. The second clause — "the right of the people to keep and bear Arms, shall not be infringed" — is not free from ambiguity. We consider it highly significant, however, that the second clause does not purport to protect the right to "possess" or "own" arms, but rather to "keep and bear" arms. This choice of words is important because the phrase "bear arms" is a phrase that customarily relates to a military function.
 
 
 50
 Historical research shows that the use of the term "bear arms" generally referred to the carrying of arms in military service — not the private use of arms for personal purposes.[28] For instance, Professor Dorf, after canvassing documents from the founding era, concluded that "[o]verwhelmingly, the term had a military connotation." Dorf, supra, at 314. Our own review of historical documents confirms the professor's report.[29] The Tennessee Supreme Court, in the most significant judicial decision to construe the term "bear arms," concluded that it referred to the performance of a military function: "A man in pursuit of deer, elk and buffaloes might carry his rifle every day for forty years, and yet it would never be said of him that he had borne arms." Aymette v. State, 21 Tenn. (2 Humph.) 154 (1840).[30] Other nineteenth-century judicial opinions evince that same understanding of the term, as it appears in the Constitution. See English v. State, 35 Tex. 473, 476 (1872) ("The word `arms' in the connection we find it in the Constitution of the United States refers to the arms of a militiaman or soldier, and the word is used in its military sense."); State v. Workman, 35 W.Va. 367, 14 S.E. 9, 11 (1891) ("[I]n regard to the kind of arms referred to in the [Second A]mendment, it must be held to refer to the weapons of war-fare to be used by the militia."); see also Lucilius A. Emery, The Constitutional Right to Keep and Bear Arms, 28 HARV. L. REV. 473, 476 (1915) ("The single individual or the unorganized crowd, in carrying weapons, is not spoken of or thought of as `bearing arms.' "). Further, the Oxford English Dictionary defines "to bear arms" as "to serve as a soldier, do military service, fight." 1 OXFORD ENGLISH DICTIONARY 634 (J.A. Simpson & E.S.C. Weiner, eds., 2d ed.1989) (quoted in Yassky, supra, at 619). Thus, the use of the phrase "bear arms" in its second clause strongly suggests that the right that the Second Amendment seeks to protect is the right to carry arms in connection with military service.
 
 
 51
 We also believe it to be significant that the first version of the amendment proposed by Madison to the House of Representatives concluded with an exemption from "bearing arms" for the "religiously scrupulous." THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS 169 (Neil H. Cogan ed., 1997) [hereinafter BILL OF RIGHTS] ("[N]o person religiously scrupulous of bearing arms, shall be compelled to render military service in person."). Historians have observed that "[n]o state at the time, nor any state before, had ever compelled people to carry weapons in their private capacity." Finkelman, supra, at 228. Accordingly, the exemption from bearing arms for the religiously scrupulous can only be understood as an exemption from carrying arms in the service of a state militia, and not from possessing arms in a private capacity. Otherwise, Madison's insertion of the religiously-scrupulous exception in the first draft of the present amendment would have made no sense at all.[31]
 
 
 52
 Finally, we address the use of the term "keep" in the second clause. The reason why that term was included in the amendment is not clear. The Emerson court, citing no authority, concludes that "keep" does not relate to military weapons and therefore the use of the word supports the position that the amendment grants individuals the right to keep arms for personal use. 270 F.3d at 232. There appears to be little logic or reason to that analysis. Arms can be "kept" for various purposes — military, social, or criminal. The question with respect to the Second Amendment is not whether arms may be kept, but by whom and for what purpose. If they may be kept so that the possessor is enabled to "bear arms" that are required for military service, the words would connote something entirely different than if they may be kept for any individual purpose whatsoever. In this connection, some scholars have suggested that "keep and bear" must be construed together (like "necessary and proper") as a unitary phrase that relates to the maintenance of arms for military service. See Dorf, supra, at 317. That argument appears to us to have considerable merit. Certainly the right to keep arms is of value only if a right to use them exists. The only right to use arms specified in the Constitution is the right to "bear" them. Thus, it seems unlikely that the drafters intended the term "keep" to be broader in scope than the term "bear." Any other explanation would run into considerable logical and historical difficulty. Furthermore, historians have noted that the right of the states to "keep" arms was a catalyst for the Revolution — it was the British troops' attempts to capture the Massachusetts militia's arsenal that prompted Paul Revere's warning and the battles at Lexington and Concord to defend the states' stores of munitions. Finkelman, supra, at 234. Accordingly, the ability of states to "keep" arms for military use without external interference undoubtedly was prominent in the minds of many founders. In the end, however, the use of the term "keep" does not appear to assist either side in the present controversy to any measurable extent. Certainly, the use of the term does not detract from the significance of the drafters' decision to protect the right to "bear" arms rather than to "own" or "possess" them. Thus, it in no way undercuts the strong implication that the right granted by the second clause relates to the performance of a military function, and not to the indiscriminate possession of weapons for personal use.
 
 
 c. The Relationship Between the Two Clauses.
 
 
 53
 Our next step is to consider the relationship between the two clauses, and the meaning of the amendment as a whole. As we have noted, and as is evident from the structure of the Second Amendment, the first clause explains the purpose of the more substantive clause that follows, or, to put it differently, it explains the reason necessitating or warranting the enactment of the substantive provision.[32] Moreover, in this case, the first clause does more than simply state the amendment's purpose or justification: it also helps shape and define the meaning of the substantive provision contained in the second clause, and thus of the amendment itself. This approach is consistent with that taken by the Supreme Court regarding the Preamble to the Constitution in a number of other instances. See, e.g., U.S. Term Limits v. Thornton, 514 U.S. 779, 821 n. 31, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (pointing to language in the Preamble to the Constitution to determine the nature of representation established in that document). More important, it is the approach that the Supreme Court has specifically declared must be employed when seeking to determine the meaning of the Second Amendment.[33]
 
 
 54
 When the second clause is read in light of the first, so as to implement the policy set forth in the preamble, we believe that the most plausible construction of the Second Amendment is that it seeks to ensure the existence of effective state militias in which the people may exercise their right to bear arms, and forbids the federal government to interfere with such exercise. This conclusion is based in part on the premise, explicitly set forth in the text of the amendment, that the maintenance of effective state militias is essential to the preservation of a free State, and in part on the historical meaning of the right that the operative clause protects — the right to bear arms. In contrast, it seems reasonably clear that any fair reading of the "bear Arms" clause with the end in view of "assuring ... the effectiveness of" the state militias cannot lead to the conclusion that the Second Amendment guarantees an individual right to own or possess weapons for personal and other purposes. See, e.g., Gillespie v. City of Indianapolis, 185 F.3d 693, 710-11 (7th Cir.1999) (adopting the collective rights theory and concluding that firearms possession related to militia service represents too attenuated a connection to the purpose and objective of the Second Amendment to support a claim of an individual right).
 
 
 55
 In the end, however, given the history and vigor of the dispute over the meaning of the Second Amendment's language, we would be reluctant to say that the text and structure alone establish with certainty which of the various views is correct. Fortunately, we have available a number of other important sources that can help us determine whether ours is the proper understanding. These include records that reflect the historical context in which the amendment was adopted, and documents that contain significant portions of the contemporary debates relating to the adoption and ratification of the Constitution and the Bill of Rights. We now examine those sources, all of which ultimately point to the same result to which our analysis of the text leads us.
 
 
 56
 2. The Historical Context of the Second Amendment and the Debates Relevant to its Adoption Demonstrate that the Founders Sought to Protect the Survival of Free States by Ensuring the Existence of Effective State Militias, Not by Establishing An Individual Right to Possess Firearms.
 
 
 57
 An examination of the historical context surrounding the enactment of the Second Amendment leaves us with little doubt that the proper reading of the amendment is that embodied in the collective rights model. We note at the outset that the interpretation of the Second Amendment lends itself particularly to historical analysis. The content of the amendment is restricted to a narrow, specific subject that is itself defined in narrow, specific terms. Only one other provision of the Bill of Rights is similarly composed — the almost never-used Third Amendment.[34] The other eight amendments all employ broad and general terms, such as "no law respecting" (the Free Exercise Clause), "unreasonable" (searches and seizures), "due process of law" (for deprivations of life, liberty, and property), "cruel and unusual" (punishments). Even the Ninth and Tenth Amendments speak vaguely of "other" rights or unenumerated "reserved" rights. The use of narrow, specific language of limited applicability renders the task of construing the Second Amendment somewhat different from that which we ordinarily undertake when we interpret the other portions of the Bill of Rights.
 
 
 58
 What our historical inquiry reveals is that the Second Amendment was enacted in order to assuage the fears of Anti-Federalists that the new federal government would cause the state militias to atrophy by refusing to exercise its prerogative of arming the state fighting forces, and that the states would, in the absence of the amendment, be without the authority to provide them with the necessary arms. Thus, they feared, the people would be stripped of their ability to defend themselves against a powerful, over-reaching federal government. The debates of the founding era demonstrate that the second of the first ten amendments to the Constitution was included in order to preserve the efficacy of the state militias for the people's defense — not to ensure an individual right to possess weapons. Specifically, the amendment was enacted to guarantee that the people would be able to maintain an effective state fighting force — that they would have the right to bear arms in the service of the state.
 
 
 a. The Problem Of Military Power in the Colonies and Confederation.
 
 
 59
 A significant motivation for the American colonists' break from Britain was a distrust of the standing army maintained by the Crown on American shores. Dorf, supra, at 308. Indeed, one of the principal complaints listed in the Declaration of the Independence was that King George III "has kept among us, in times of peace, Standing Armies without the Consent of our legislatures. He has affected to render the Military independent of and superior to the Civil power." THE DECLARATION OF INDEPENDENCE para. 2 (U.S.1776). Standing armies in the colonial era were looked on with great skepticism: "The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia." Miller, 307 U.S. at 179, 59 S.Ct. 816. Even after the break with Britain, a large portion of Americans had grave reservations about establishing a permanent standing army.[35]
 
 
 60
 Nevertheless, many other newly independent Americans expressed the need to strengthen the federal fighting force, even in peacetime. During the brief period in which the Articles of Confederation were in effect, from 1781-1789, relatively weak federal authority existed, particularly as related to military matters. The bulwark of the national defense was the state militias, which bodies the states could voluntarily contribute to the services of the Confederation. The states retained the sole power to arm and otherwise to maintain their respective militias. The Articles of Confederation specifically granted that power (and obligation) to the states: "[E]very state shall always keep up a well regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition and camp equipage." THE ARTICLES OF CONFEDERATION, supra, art. 6. It is highly significant that prior to the enactment of the Constitution, the prevailing understanding as expressed in the governing charter then in effect was that the responsibility of arming their militias belonged to the states, not the federal government and not the individual militiamen.[36] It was this function of the states, albeit no longer an exclusive one after the Constitution was adopted, that the Anti-Federalists attempted to preserve, through the enactment of the Second Amendment, in order to ensure that the militias would be effective.
 
 
 61
 Many leaders of the Revolution expressed concern that as the Continental Army disbanded following the cessation of hostilities with England, the various state militias were inadequate to provide for the common defense due to their poor training and equipment.[37] The establishment of a national armed force was one of the primary reasons that the Constitutional Convention in 1787 was convened. The issue pervaded the convention's debates. In Virginia Governor Edmund Randolph's opening speech at the convention — in which he suggested that the body reject the Articles of Confederation entirely in favor of a new constitution, rather than merely revise them — Randolph cited military reform as a principal reason for strengthening the federal charter: "[T]he confederation produced no security against foreign invasion ... neither militia nor [state] draughts being fit for defence on such occasions." 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 17 (Max Farrand ed., rev. ed.1937)[hereinafter CONVENTION RECORDS]. Randolph also "observ[ed] that the Militia were every where neglected by the State Legislatures, the members of which courted popularity too much to enforce a proper discipline." 2 id., at 388. Other delegates to the Convention shared this view. Influential South Carolinian Charles Pinckney, for instance, maintained that a stronger federal government was necessary principally so as to maintain "a real military force." Id. at 332.[38] The compromise that the convention eventually reached, which granted the federal government the dominant control over the national defense, led ultimately to the enactment of the counter-balancing Second Amendment.
 
 
 b. The Constitutional Convention and the Compromise of the Army and Militia Clauses
 
 
 62
 The minutes of the proceedings of the Constitutional Convention reveal that the delegates to the convention devoted substantial efforts to determining the proper balance between state and federal control of military matters. See Yassky, supra, at 599 (describing this issue as "one of the most contentious issues faced by the Philadelphia Convention."). See also 2 CONVENTION RECORDS, supra, at 380-89 (debates regarding the Militia Clauses). Despite the general view that "standing armies are dangerous to liberty," THE FEDERALIST NO. 29, at 183 (Alexander Hamilton) (Clinton Rossiter ed., 1961), and over the objection of some Anti-Federalists, the delegates to the convention agreed that a national army was "potentially dangerous" but "necessary." Yassky, supra, at 605. Thus, Article I of the proposed constitution granted Congress the authority to establish a "National Army," and Article II established the President as commander-in-chief of that army.
 
 
 63
 The delegates at Philadelphia also provided for the strengthening of the state militias, in part to provide a check on the new national army. "As the greatest danger to liberty is from large standing armies, it is best to prevent them by an effectual provision for a good Militia." 2 CONVENTION RECORDS, supra, at 388 (Statement of James Madison). Under the compromise reached by the delegates, the militias were strengthened by the grant to Congress of substantial responsibility for their management, although they remained essentially state entities. On the one hand, the Constitution granted Congress the power to prescribe methods of organizing, arming and disciplining the state militias. U.S. CONST. art. I, § 8, cl. 15. On the other, the states expressly retained the power to appoint militia officers and provide the militiamen with their training, in accordance with Congressional dictates, if any. See Perpich v. Department of Defense, 496 U.S. 334, 340, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990) (observing that the Militia Clauses were the result of "[t]wo conflicting themes."). The provision that most troubled the Anti-Federalists, and that prompted the most strident calls for amendment to the proposed constitution, was the one that authorized Congress to provide arms to the militias. The disagreement among the delegates arose not over whether Congress should be able to arm the militias at all, but over whether that power should be exclusive or concurrent with a state power to provide such arms — as well as over how other responsibilities for the militias should be distributed between the state and federal governments. Id.
 
 
 64
 Federalists[39] defended the compromise that was reached, which greatly increased federal involvement in the management of the militias, in part by arguing that stronger state militias would provide an important counterbalance to the new national army.[40] In an effort to persuade the nation at large to ratify the proposed constitution, both Hamilton and Madison in The Federalist Papers pointed out that the state militias might even be called upon to resist the federal army should that body become oppressive. For instance, in Federalist No. 46, Madison argued:
 
 
 65
 Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government: still it would not be going too far to say that the State governments with the people on their side would be able to repel the danger.... Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of.
 
 
 66
 THE FEDERALIST NO. 46, at 267 (Clinton Rossiter ed., 1961).[41] See also THE FEDERALIST NO. 28, at 150 (Clinton Rossiter ed., 1961) (Hamilton). In sum, what the debates held at the constitutional convention make clear, as well as the compromise that resulted, is that the balance of military power between the states and the federal government, although now an anachronistic subject foreign to our mode of thinking, was, at the time of the founding, a preeminent and much-debated question.
 
 
 c. Anti-Federalist Objections and the Ratification Debates
 
 
 67
 The Anti-Federalists sought to ensure that the people of the several states would enjoy the protection of effective state militias so that their new-found liberties would be preserved. To accomplish this purpose, they sought to change, or at the least, to clarify, the nature of the proposed balance of military power between the state and federal governments. Despite the arguments advanced by Hamilton, Madison, and others,[42] federal control over state militias remained one of the central objections to the new charter on the part of Anti-Federalists. In particular, if the federal Congress were permitted to "organiz[e], arm[], and disciplin[e]" the militia, opponents of the Constitution contended, then Congress would have the implied power to disarm the state militias and thus the people as well. One of the principal arguments against ratification of the new Constitution was that it would take away from the states the right to arm the members of its militias, and thus could deprive the people of an effective counter-force to the new national army. Without an armed militia, the argument went, the people would be bereft of arms. For instance, Patrick Henry, a leading Anti-Federalist at the Virginia ratifying convention, attacked the grant of power that permitted Congress to arm the militias:
 
 
 68
 By this [provision], sir, you see that [congressional] control over our last and best defence is unlimited. If they neglect or refuse to discipline or arm our militia, they will be useless: the states can do neither — this power being exclusively given to Congress. The power of appointing officers over men not disciplined or armed is ridiculous....
 
 
 69
 3 DEBATES, supra, at 379 (Statement of Patrick Henry). George Mason's concerns were similar; he predicted that Congress would "neglect [the militia], and let them perish, in order to have a pretence of establishing a standing army." 3 DEBATES, supra, at 379. See also North Carolina Ratification Debate, in BILL OF RIGHTS, supra, at 191 ("[Congress] can disarm the militia.") (Statement of Rep. Lenoir). The Anti-Federalists viewed the state militias as providing the only true opportunity for the people to bear arms. Luther Martin of Maryland's alarmist rhetoric was typical of those who complained that the new Constitution jeopardized the people's freedom because it deprived them of effective state militias and thus of their means of self-defense. Martin stated:
 
 
 70
 It was urged [at Philadelphia] that, if after having retained to the general government the great powers already granted, and among those, that of raising and keeping up regular troops without limitations, the power over the militia should be taken away from the States, and also given to the general government, it ought to be considered as the last coup de grace to the State governments;... and that every State in the Union ought to reject such a system with indignation, since, if the general government should attempt to oppress and enslave them, they could not have any possible means of self-defense....
 
 
 71
 3 CONVENTION RECORDS, supra, at 209. The Anti-Federalist concern was that if Congress possessed exclusive power to arm the militia, the people would be incapable of resisting federal tyranny.[43] Although Federalists, like Madison, responded that "[t]he power [to arm the militia] is concurrent, and not exclusive," BILL OF RIGHTS, supra, at 195, the Anti-Federalists remained adamant. From the perspective of history, the Anti-Federalists' worries that the new national government would permit the state militia to atrophy through neglect may seem to be inconsequential, because we have become so accustomed to the provision of defense being essentially a federal function, and so few of us remain concerned with any right of the people to take up arms against the federal government.[44] Nevertheless, such arguments were central to the Anti-Federalist critique of the proposed new government.
 
 
 72
 Despite the Anti-Federalist arguments regarding the dangers of the distribution of powers with respect to state militias, and the effect upon the people's ability to provide for their own defense, it soon became clear that the requisite number of states would ratify the new Constitution. Once it became apparent that ratification was likely, Anti-Federalists shifted their efforts from defeating the Constitution to securing amendments, to be adopted almost simultaneously, that would render the new system more to their liking. Six of the state ratifying conventions adopted petitions urging that the newly established federal government enact a series of constitutional amendments, many of which became a part of the Bill of Rights. Four of those six state conventions included proposed amendments related to the militia power: New York, Virginia, Rhode Island, and North Carolina all proposed amendments similar in wording to the Second Amendment in its final form. BILL OF RIGHTS, supra, at 181-83. Ratification debates from those states demonstrate that the proposed amendments had nothing to do with an individual right to possess arms, whether for personal or other use. Indeed, the ratification debates were almost entirely-but not completely-devoid of any mention of an individual right to own weapons.[45] Rather, the proposed amendments were the result of concerns expressed in the various ratifying conventions — similar to those expressed at the Constitutional Convention itself — regarding the "defin[ition of] the respective powers of two levels of government" over the militia, and particularly over whether states would have the authority to arm the militias. Rakove, supra, at 161; see Finkelman, supra, at 224-25 (citing state ratification debates from New York and Massachusetts).
 
 
 73
 One of the strongest attacks on the proposed treatment of the militia in the Constitution was delivered by George Mason at the Virginia ratifying convention:
 
 
 74
 The militia may be here destroyed by that method which has been practised in other parts of the world before; that is, by rendering them useless—by disarming them. Under various pretences, Congress may neglect to provide for arming and disciplining the militia; and the state governments cannot do it, for Congress has an exclusive right to arm them, & c. ... Should the national government wish to render the militia useless, they may neglect them, and let them perish, in order to have a pretence of establishing a standing army.
 
 
 75
 3 DEBATES, supra, at 379 (Statement of George Mason). Mason, like other Anti-Federalists, feared that the neglect of the state militia would lead to the oppression of the people, because without an effective militia the people would be defenseless, and thus he urged that the people's right to an effective militia be secured by an amendment to the new Constitution. He, like the others, saw the people's right to self-defense exclusively in terms of the maintenance of a strong militia. Thus, the Anti-Federalists worried that the federal government would deprive the militia of its arms, not that it would take personal weapons from individual citizens. In order to meet that concern, Mason proposed an amendment similar in wording to what became the Second Amendment. He believed that the amendment would guarantee the people a militia that the state would be free to arm and thus render effective. He justified it as a protection for the people against tyranny and oppression by the federal government:
 
 
 76
 But we need not give [the federal government] power to abolish our militia. If they neglect to arm them, and prescribe proper discipline, they will be of no use. I am not acquainted with the military profession. I beg to be excused for any errors I may commit with respect to it. But I stand on the general principles of freedom, whereon I dare to meet any one. I wish that, in case the general government should neglect to arm and discipline the militia, there should be an express declaration that the state governments might arm and discipline them. I consider and fear the natural propensity of rulers to oppress the people. I wish only to prevent them from doing evil. By these amendments I would give necessary powers, but no unnecessary power. If the clause stands as it is now, it will take from the state legislatures what divine Providence has given to every individual—the means of self-defence. Unless it be moderated in some degree, it will ruin us....
 
 
 77
 Id. at 380 (emphasis added).
 
 
 78
 In short, to the extent that the ratification debates concerned firearms at all, the discussion related to the importance of ensuring that effective state militias be maintained, such militias being considered essential to the preservation of the people's freedom. Those who deemed the Constitution inadequate for this purpose, absent some amendment, emphasized the importance of the states' being afforded the right to arm their own militias, thus ensuring the people's right to maintain a military force for their self-defense.
 
 
 79
 There were only a few isolated voices that sought to establish an individual right to possess arms, and alone among the 13 colonies, New Hampshire, by a majority vote of the delegates to its ratifying convention, recommended a proposed amendment to the Constitution explicitly establishing a personal right to possess arms: "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." Proposal 12 of the New Hampshire State Convention (June 21, 1788), in BILL OF RIGHTS, supra, at 181. The New Hampshire proposal is significant not only because it was substantially different from the proposals to emerge from the various other state conventions (which in turn were quite similar to that ultimately enacted as the Second Amendment), but also because it suggests that an amendment establishing an individual right to bear arms would have been worded quite differently from the Second Amendment. In no other state did a proposal to establish an individual right to possess arms gain significant support. For instance, while one member of the Pennsylvania ratifying convention vociferously urged the inclusion of such a proposal in the recommendations made by that body to the First Congress,[46] his views, like those of another few elsewhere who called for the establishment of such a right, were soundly rejected.[47] As two commentators have observed, "the failure of Pennsylvania's one man `minority' merely accentuates the fact that opinion favoring a personal right to arms independent of the militia remained highly marginal in state conventions outside of New Hampshire." Uviller & Merkel, supra, at 486.[48] In sum, a careful review of the ratification debates demonstrates beyond question that opponents of the new Constitution sought amendment of the Militia Clauses in order to preserve the people's right to maintain an effective military force for their self-defense, and not to afford individuals a constitutional right to possess weapons.[49]
 
 
 d. The First Congress and the Second Amendment
 
 
 80
 By the conclusion of the process by which the Constitution was ratified, there were already countless proposals for altering the new governing charter; the Virginia convention alone offered forty. Finkelman, supra, at 216. Madison, who was responsible for many of the compromises reached at the Constitutional Convention, as well as for many of The Federalist Papers, represented Virginia in the First Congress, which met in New York in April, 1789. He deftly pre-empted Anti-Federalist efforts to change fundamentally the new Constitution by introducing twelve proposed amendments soon after the new legislature convened. Uviller and Merkel, supra, at 498-99. Madison was unenthusiastic about the idea of upsetting the delicate balances achieved by the delegates in Philadelphia by importing new concepts into the document. He sought to ensure that the amendment process left the "structure and stamina of the Govt. as little touched as possible." Letter from James Madison to Edmund Randolph (June 15, 1789) (quoted in Finkelman, supra, at 220); see also Paul Finkelman, James Madison and the Bill of Rights: "A Reluctant Paternity", 1990 SUP. CT. REV. 301, 309 (1991). The amendments Madison proposed sought to eliminate ambiguities in the document that had been ratified, or to enumerate principles that he believed were implicit within it. Id.[50]
 
 
 81
 The debates of the First Congress regarding Madison's proposed Second Amendment, like the debates at the Constitution's ratifying conventions, support the view that the amendment was designed to ensure that the people retained the right to maintain effective state militias, the members of which could be armed by the states as well as by the federal government. Otherwise, the anti-Federalists feared, the federal government could, by inaction, disarm the state militias (and thus deprive the people of the right to bear arms). No one in the First Congress was concerned, however, that federal marshals might go house-to-house taking away muskets and swords from the man on the street or on the farm. Notably, there is not a single statement in the congressional debate about the proposed amendment that indicates that any congressman contemplated that it would establish an individual right to possess a weapon. See Rakove, supra, at 210-11. Moreover, in other public fora, some of the framers explicitly disparaged the idea of creating an individual right to personal arms. For instance, in a highly influential treatise, John Adams ridiculed the concept of such a right, asserting that the general availability of arms would "demolish every constitution, and lay the laws prostrate, so that liberty can be enjoyed by no man — it is a dissolution of the government." 3 JOHN ADAMS, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES 475 (1787).[51]
 
 
 82
 Equally important, almost all of the discussion in the First Congress about the proposed amendment related to the conscientious objector provision, which, as we noted earlier, was ultimately removed. See 5 THE FOUNDER'S CONSTITUTION 210-12 (Philip B. Kurland & Ralph Lerner, eds., 1987) (minutes of congressional debate). The fact that the overwhelming majority of the debate regarding the proposed Second Amendment related to the conscientious objector provision demonstrates that the congressmen who adopted the amendment understood that it was concerned with the subject of state militias. A right not to bear arms due to conscientious objection can only mean a right not to be compelled to carry arms that the government seeks to make one bear — to perform military service that one is unwilling to perform. There is no possible relevance of the term "conscientious objection" to a constitutional amendment guaranteeing a private right to possess firearms. Thus, if the Second Amendment was in fact designed to establish an individual right, the debate over the conscientious objector provision would have been entirely purposeless.[52]
 
 
 83
 In sum, our review of the historical record regarding the enactment of the Second Amendment reveals that the amendment was adopted to ensure that effective state militias would be maintained, thus preserving the people's right to bear arms. The militias, in turn, were viewed as critical to preserving the integrity of the states within the newly structured national government as well as to ensuring the freedom of the people from federal tyranny. Properly read, the historical record relating to the Second Amendment leaves little doubt as to its intended scope and effect.
 
 
 84
 3. Text, History, and Precedent All Support the Collective Rights View of the Amendment.
 
 
 85
 We reaffirm our earlier adherence to the collective rights interpretation of the Second Amendment, although for reasons somewhat different from those we stated in Hickman. Hickman rested on a canvass of our sister circuits and a summary evaluation of Miller. Miller did not, however, definitively resolve the nature of the right that the Second Amendment establishes. As we observed earlier, the relevant statements in Miller are all expressed in negative terms. Although those negative statements rule out the traditional individual rights model, the Court took no specific affirmative position as to what rights the amendment does protect. Thus, our decision regarding the nature of the rights guaranteed by the Second Amendment must be guided by additional factors — the text and structure of the amendment, an examination of the materials reflecting the historical context in which it was adopted, and a review of the deliberations that preceded the enactment of the amendment — considered in a manner that comports with the rationale of Miller.
 
 
 86
 After conducting our analysis of the meaning of the words employed in the amendment's two clauses, and the effect of their relationship to each other, we concluded that the language and structure of the amendment strongly support the collective rights view. The preamble establishes that the amendment's purpose was to ensure the maintenance of effective state militias, and the amendment's operative clause establishes that this objective was to be attained by preserving the right of the people to "bear arms" — to carry weapons in conjunction with their service in the militia. To resolve any remaining uncertainty, we carefully examined the historical circumstances surrounding the adoption of the amendment. Our review of the debates during the Constitutional Convention, the state ratifying conventions, and the First Congress, as well as the other historical materials we have discussed, confirmed what the text strongly suggested: that the amendment was adopted in order to protect the people from the threat of federal tyranny by preserving the right of the states to arm their militias. The proponents of the Second Amendment believed that only if the states retained that power could the existence of effective state militias — in which the people could exercise their right to "bear arms" — be ensured. The historical record makes it equally plain that the amendment was not adopted in order to afford rights to individuals with respect to private gun ownership or possession. Accordingly, we are persuaded that we were correct in Hickman that the collective rights view, rather than the individual rights models, reflects the proper interpretation of the Second Amendment. Thus, we hold that the Second Amendment imposes no limitation on California's ability to enact legislation regulating or prohibiting the possession or use of firearms, including dangerous weapons such as assault weapons. Plaintiffs lack standing to assert a Second Amendment claim, and their challenge to the Assault Weapons Control Act fails.
 
 
 87
 C. The AWCA's Provisions Regarding Off Duty Police Officers Do Not Offend The Fourteenth Amendment; However, There Is No Rational Basis For the Retired Officer Exemption.
 
 
 88
 Plaintiffs contend that the privileges that are afforded to off-duty and retired peace officers under the AWCA violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution. Specifically, they contend that the pertinent provisions afford benefits to off-duty and retired officers that are unavailable to the plaintiffs, and that there is no rational reason that they and other law-abiding citizens should be treated differently than off-duty and retired peace officers.[53] The district court held that both the off-duty provision and the retired officers exception comport with the requirements of the Equal Protection Clause. We affirm the district court's decision with respect to the off-duty provision, but reverse as to the exception for retired peace officers.
 
 
 89
 1. The Applicable Standard of Equal Protection Review
 
 
 90
 When a state statute burdens a fundamental right or targets a suspect class, that statute receives heightened scrutiny under the Fourteenth Amendment's Equal Protection Clause. Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Statutes that treat individuals differently based on their race, alienage, or national origin "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1986). Statutes infringing on fundamental rights are subject to the same searching review. See, e.g., Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (right to marry); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to interstate travel). However, if a legislative act neither affects the exercise of a fundamental right, nor classifies persons based on protected characteristics, then that statute will be upheld "if the classification drawn by the statute is rationally related to a legitimate state interest." Schweiker v. Wilson, 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981).
 
 
 91
 Here, plaintiffs assert that because their Second Amendment rights are fundamental, any statute allowing some persons to exercise those rights differently from others should be subject to strict scrutiny. Because we conclude in Section B, supra, that plaintiffs have no constitutional right to own or possess weapons, heightened scrutiny does not apply. Thus, we apply rational-basis review to plaintiffs' claims that the AWCA provisions violate the Equal Protection Clause.
 
 
 92
 2. General Principles of Rational Basis Review.
 
 
 93
 The Supreme Court has observed that the rational-basis test is "a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions" is primarily a task for legislatures. Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Nevertheless, several general principles may be distilled from the several (and sometimes contradictory) cases in which the Supreme Court has applied the test.
 
 
 94
 First, in order for a state action to trigger equal protection review at all, that action must treat similarly situated persons disparately. City of Cleburne, 473 U.S. at 439, 105 S.Ct. 3249; Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("The Equal Protection Clause ... keeps governmental decision-makers from treating differently persons who are in all relevant respects alike."); Dillingham v. INS, 267 F.3d 996, 1007 (9th Cir.2001).
 
 
 95
 Second, when assessing the validity of legislation under the rational-basis test, "the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne, 473 U.S. at 439, 105 S.Ct. 3249; see also Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).
 
 
 96
 Third, there must exist some rational connection between the state's objective for its legislative classification and the means by which it classifies its citizens. Although rational-basis review is undoubtedly deferential — indeed, a "paradigm of judicial restraint," FCC v. Beach Communications, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) — it is nevertheless our duty to scrutinize the connection, if any, between the goal of a legislative act and the way in which individuals are classified in order to achieve that goal. "The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass...." Romer, 517 U.S. at 632, 116 S.Ct. 1620; see also Nordlinger v. Hahn, 505 U.S. 1, 31, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (Stevens, J., dissenting) ("[D]eference is not abdication and "rational-basis scrutiny" is still scrutiny."); Peoples Rights Org. v. City of Columbus, 152 F.3d 522, 532 (6th Cir.1998) ("Rational-basis review, while deferential, is not `toothless.'") (quoting Mathews v. Lucas, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)).
 
 
 97
 Finally, the burden falls upon the party attacking a legislative classification reviewed under the rational-basis standard to demonstrate that there is no reasonable basis for the challenged distinction. When a statute is reviewed under the rational-basis test, "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citation and quotation marks omitted); see also Lucas, 427 U.S. at 510, 96 S.Ct. 2755. The legislative record need not contain empirical evidence to support the classification so long as the legislative choice is a reasonable one. Beach Communications, 508 U.S. at 315, 113 S.Ct. 2096; Nordlinger, 505 U.S. at 15, 112 S.Ct. 2326 ("[T]he Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decision-maker actually articulate at any time the purpose or rationale supporting its classification.") (citation omitted). Although the government is relieved of providing a justification for a statute challenged under the rational-basis test, such a justification must nevertheless exist, or the standard of review would have no meaning at all. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." Romer, 517 U.S. at 632, 116 S.Ct. 1620.
 
 
 98
 With these general principles in mind, we turn to the two provisions that plaintiffs challenge under the Equal Protection Clause.
 
 3. The Validity of the Two AWCA Provisions
 
 a. The Off-duty Officer Provision
 
 
 99
 The appellants' attack on the AWCA provision applicable to off-duty peace officers is easily resolved. It is manifestly rational for at least most categories of peace officers to possess and use firearms more potent than those available to the rest of the populace in order to maintain public safety. The off-duty officer exception provides that an off-duty officer permitted to possess and use the assault weapons must do so only for "law enforcement purposes." § 12280(g). We presume that off-duty officers may find themselves compelled to perform law enforcement functions in various circumstances, and that in addition it may be necessary that they have their weapons readily available. Thus, the provision is designed to further the very objective of preserving the public safety that underlies the AWCA. Consequently, there is a rational basis for the provision, and it comports with the requirements of the Fourteenth Amendment.[54]
 
 
 b. The Retired Officer Exception
 
 
 100
 In contrast, the retired officer exception has no such clearly rational basis. The amendments to the AWCA provide that the California agencies listed at note 6, supra, may sell or transfer assault weapons to a sworn peace officer upon the retirement of that officer. § 12280(h). The exception does not require that the transfer be for law enforcement purposes, and the possession and use of the weapons is not so limited.[55]
 
 
 101
 Initially, we observe that allowing residents of California to obtain assault weapons for purposes unrelated to law enforcement is wholly contrary to the legislature's stated reasons for enacting restrictions on assault weapons. As set forth more fully above, the legislature found that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens in this state."[56] When the legislature first passed the AWCA, the entire Assembly, sitting as the Committee of the Whole, heard testimony from the California Attorney General, the chiefs of police of several local jurisdictions, public health experts, and the relatives of crime victims about the devastating effects of assault weapons on California communities. See 1 CAL. ASSEMBLY J., at 435-59 (Feb. 13, 1989). In light of the unequivocal nature of the legislative findings, and the content of the legislative record, there is little doubt that any exception to the AWCA unrelated to effective law enforcement is directly contrary to the act's basic purpose of eliminating the availability of high-powered, military-style weapons and thereby protecting the people of California from the scourge of gun violence.[57] See United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) ("The challenged statutory classification ... is clearly irrelevant to the stated purpose of the Act.").
 
 
 102
 However, our inquiry cannot end here. We must attempt to identify any hypothetical rational basis for the exception, whether or not that reason is in the legislative record. See id. In response to a request from this court for supplemental briefing on the question of whether there is a rational basis for the retired officer exception, the state offered three justifications for the exception. None is in any way persuasive.
 
 
 103
 First, the state argues that because a similar exception exists in the federal assault weapons law enacted in 1994, the provision "ostensibly withstood the rational basis test federally." However, the mere existence of the same distinction in a federal statute is not probative evidence that the provision is rational. Although we must presume that the legislative classification challenged in this case has a rational basis, Schweiker v. Wilson, 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981), that presumption cannot be bolstered by the fact that the same classification exists in another jurisdiction's statute. An unconstitutional statute adopted by a dozen jurisdictions is no less unconstitutional by virtue of its popularity.
 
 
 104
 Second, the state argues that because some peace officers receive more extensive training regarding the use of firearms than do members of the public, allowing any retired officer to possess assault weapons for non-law enforcement purposes is reasonable. This justification is basically inconsistent with the legislative purpose of the AWCA; it bears no reasonable relationship to the stated legislative purpose of banning the possession and use of assault weapons in California, except for certain law enforcement purposes. The object of the statute is not to ensure that assault weapons are owned by those most skilled in their use; rather, it is to eliminate the availability of the weapons generally. Not only is the retired officers exception contrary to the purpose of the AWCA, its relationship to any legitimate state goal "is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne, 473 U.S. at 446, 105 S.Ct. 3249.
 
 
 105
 The state's third argument fails also. The state contends that the retired officers exception is rational because it allows retiring peace officers to keep their duty weapons, which in some cases the officer may have purchased with his own funds. However, the retired officer provision contains no such limitation; indeed, on its face the statute would permit the transfer of any number of assault weapons to any peace officer, regardless of whether that officer had ever come into contact with the weapons being acquired. Indeed, in contrast to the off-duty officer provision, under the retired officers' exception the retiree may possess and use assault weapons for any purpose whatsoever.[58]
 
 
 106
 We may not complete our evaluation of the statute's validity merely by examining the state's proffered justifications for the law. Rather, we must determine whether any reasonable theory could support the legislative classification. Heller, 509 U.S. at 320, 113 S.Ct. 2637. An exception to the assault weapons law for retired officers might arguably be rational if California required its retired peace officers to participate as reserves in the event of an emergency. However, there is no such requirement in California. Moreover, even if there were such a requirement, a statute that permitted retired peace officers — at their discretion — to obtain assault weapons and use them for unlimited purposes, and in an unregulated manner, would not reasonably advance the objective of establishing a reserve force of retired officers prepared to act in emergencies.
 
 
 107
 We thus can discern no legitimate state interest in permitting retired peace officers to possess and use for their personal pleasure military-style weapons. Rather, the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs.
 
 
 108
 In sum, not only is the retired officers' exception contrary to the legislative goals of the AWCA, it is wholly unconnected to any legitimate state interest. A statutory exemption that bears no logical relationship to a valid state interest fails constitutional scrutiny. The 1999 AWCA amendments include, however, a severability provision providing that should any portion of the statute be found invalid, the balance of the provisions shall remain in force. Accordingly, because the retired officers' exception is an arbitrary classification in violation of the Fourteenth Amendment, we sever that provision, § 12280(h)-(i), from the AWCA.
 
 III. ADDITIONAL CONSTITUTIONAL CLAIMS
 
 109
 Plaintiffs assert three additional constitutional claims that we can dispose of readily. First, Plaintiffs who own assault weapons contend that the AWCA violates the takings clause of the Fifth Amendment because it reduces the value of those weapons. It is well-established, however, that a government may enact regulations pursuant to its broad powers to promote the general welfare that diminish the value of private property, yet do not constitute a taking requiring compensation, so long as a reasonable use of the regulated property exists. Am. Sav. & Loan Ass'n v. County of Marin, 653 F.2d 364, 368 (9th Cir.1981) ("If the regulation is a valid exercise of the police power, it is not a taking if a reasonable use of the property remains."); see Andrus v. Allard, 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) ("A reduction in the value of property is not necessarily a taking."). Here, plaintiffs who owned assault weapons prior to the enactment of the AWCA are protected by a grandfather clause that permits them to use the weapons in a number of reasonable ways so long as they register them with the state. In light of the substantial safety risk posed by assault weapons that prompted the passage of the AWCA, any incidental decrease in their value caused by the effect of that act does not constitute a compensable taking. Am. Sav. & Loan Ass'n, 653 F.2d at 368.
 
 
 110
 Second, plaintiffs challenge the registration provisions of the AWCA as violative of their informational privacy rights. Although there does exist an "individual interest in avoiding [government] disclosure of personal matters," Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), that right "is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." Crawford v. United States Tr., 194 F.3d 954, 959 (9th Cir.1999) (citing Doe v. Attorney Gen., 941 F.2d 780, 796 (9th Cir.1991)). Here, applying the factors set forth in Doe, we conclude that the government's goal in establishing a public registry of those who possess assault weapons is a proper governmental interest, and the plaintiffs' interests in maintaining confidential the fact of their assault weapon ownership are minimal. Accordingly, we affirm the dismissal of this claim.
 
 
 111
 Finally, plaintiffs contend that the retired and off-duty officer provisions of the statute require association with law enforcement officers in order to obtain the benefits of the provisions. Thus, plaintiffs argue, the statute violates their First Amendment rights. This claim has no merit; even aside from the fact that we have directed that the retired officer provision be severed, the statute plainly requires no person to associate with any other person. The district court therefore correctly dismissed this claim as well.
 
 IV. CONCLUSION
 
 112
 Because the Second Amendment affords only a collective right to own or possess guns or other firearms, the district court's dismissal of plaintiffs' Second Amendment claims is AFFIRMED. Because the off-duty officer provision is supported by a rational basis, the district court's dismissal of plaintiffs' equal protection claim challenging that provision is also AFFIRMED. However, because no rational basis exists for the retired officers exception, we REVERSE the district court's dismissal of that claim and direct that judgment be entered for the plaintiffs in that regard. The constitutional challenges to the validity of the California Assault Weapons Control Act are all rejected, with the exception of the claim relating to the retired officers provision.
 
 
 113
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 Semiautomatic weapons differ from fully automatic machine guns in the following respects: Automatic weapons feed ammunition into the gun's chamber immediately after the firing of each bullet, so that the weapon will continue to reload and fire continuously so long as the trigger is depressed. Purchase and ownership of automatic weapons has been restricted by the federal government since the days of Al Capone and the machine gun violence associated with the Prohibition EraSee EARL R. KRUSCHKE, GUN CONTROL: A REFERENCE HANDBOOK 84, 170 (1995)(discussing the enactment of the National Firearms Act of 1934, ch. 757, 48 Stat. 1236 (1934)(current version codified as 26 U.S.C. §§ 5801-72), as a reaction to the use of machine guns by mobsters and "organized crime elements").
 In contrast to automatic weapons, only one bullet is fired when the user of a semi-automatic weapon depresses the trigger, but another is automatically reloaded into the gun's chamber. 27 C.F.R. § 178.11 (defining semiautomatic weapons). Thus, by squeezing the trigger repeatedly and rapidly, the user can release many rounds of ammunition in a brief period of time-certainly many more than the user of a standard, manually-loaded weapon. Moreover, the semi-automatic weapons known as assault weapons contain large-capacity magazines, which require the user of the weapon to cease firing to reload relatively infrequently because the magazines contain so much ammunition. Consequently, users of such weapons can "spray-fire" multiple rounds of ammunition, with potentially devastating effects. Michael G. Lennett, Taking A Bite Out of Violent Crime, 20 U. DAYTON L. REV. 573, 609 (1995).
 
 
 [2]
 An individual who lawfully obtained an assault weapon prior to the enactment of the AWCA may avoid the requirement of registering it with the state if he renders the weapon permanently inoperable, relinquishes it to a state law enforcement agency, sells it to a licensed California firearms dealer, or removes it from the State of California
 
 
 [3]
 A person who has registered an assault weapon may possess the weapon only at his own residence, his place of business, certain private and public clubs organized for the purpose of target shooting, certain firearms exhibitions approved by law enforcement agencies, or on specified public lands. § 12285(c)(1)-(6). Additionally, an assault weapon owner may transport his registered weapon to any of the above locations only so long as he complies with the methods of transportation prescribed in the statute. § 12285(7); § 12026.1
 
 
 [4]
 Unless otherwise noted, citations to statutory provisions in this opinion refer to the sections of the AWCA as codified in the California Penal Code
 
 
 [5]
 The reason that the legislature defined the restricted assault weapons generically, by feature, is that after the enactment of the AWCA, gun manufacturers began to produce "copycat" weapons in order to evade the statute's restrictions. These weapons varied only slightly from the models listed in the act, but were different enough from those models that they evaded the law's restrictions. Martha L. Willman,Davis Backs Bill to Limit Assault Gun Sale and Use Legislation, L.A. TIMES, Apr. 27, 1999, at B2.
 
 
 [6]
 The specified agencies include the California Department of Justice, police departments, sheriffs' departments, marshals' offices, the Youth and Adult Corrections Agency, the Department of the California Highway Patrol, district attorneys' offices, Department of Fish and Game, and Department of Parks and Recreation. § 12280(f). Also included were members of the "military or naval forces of this state or of the United States."Id.
 
 
 [7]
 The nine plaintiffs include,inter alia, two California National Guardsmen (both combat veterans), a San Francisco police officer, an insurance agent, a chemical engineer, and a California correctional officer.
 
 
 [8]
 In the Fifth Circuit's decision inEmerson, that court describes a view of the amendment that it calls the "sophisticated collective rights model." 270 F.3d at 219. That view of the amendment holds that individual members of state militia may personally use and possess firearms, but only to the extent that they do so as part of their active military service. Id. We conclude that a more plausible theory is that which we describe as the "limited individual right" model. Of course, one could posit a series of variations on the Second Amendment theme, including a number of potential approaches differing only in degree from each other. The Fifth Circuit's "sophisticated collective rights model," however, appears to be a strawman that can all too readily be disposed of, as the Fifth Circuit does with relatively little difficulty. Ultimately, the Fifth Circuit adopts a weapons-based theory of the amendment that permits individuals to possess firearms for personal use, regardless of the relationship of the individual or the weapon to militia service, as long as those weapons have a "legitimate use in the hands of private individuals." Emerson, 270 F.3d at 223 (quoting the government's brief in United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)). We conclude, respectfully, that the Fifth Circuit's theory is contrary not only to Miller but to the basic purpose and effect of the Second Amendment.
 
 
 [9]
 Justice Thomas did not explain why it was relevant that the Court had not ruled on the issue recently or why a Second Amendment decision might be of less force if it was handed down by an earlier Court
 
 
 [10]
 InHickman, we held that an individual could not bring a Second Amendment challenge to a California law which requires that a permit be obtained in order to carry a concealed weapon, and, as noted in the text, unambiguously adopted the view that the Second Amendment establishes a collective right. Nevertheless, just six days after the issuance of that decision, Judge Alex Kozinski, acknowledgedly an extremely able and dedicated jurist, appeared to cling fast to the individual rights view, despite the existence of binding circuit precedent to the contrary that may in no way be dismissed as dicta. United States v. Gomez, 92 F.3d 770, 774 n. 7 (9th Cir.1996). The two other judges in Gomez, one of whom was the author of Hickman, refused to join in the footnote.
 
 
 [11]
 See Gillespie v. City of Indianapolis, 185 F.3d 693, 710 (7th Cir.1999), cert. denied, 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000); United States v. Wright, 117 F.3d 1265, 1273-74 (11th Cir.), cert. denied, 522 U.S. 1007, 118 S.Ct. 584, 139 L.Ed.2d 422 (1997); United States v. Rybar, 103 F.3d 273, 286 (3d Cir.1996), cert. denied, 522 U.S. 807, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir.), cert. denied, 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 27 (1995); United States v. Hale, 978 F.2d 1016, 1019-20 (8th Cir.1992), cert. denied, 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993); Thomas v. Members of City Council, 730 F.2d 41, 42 (1st Cir.1984) (per curiam); United States v. Oakes, 564 F.2d 384, 387 (10th Cir.1977), cert. denied, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978); United States v. Warin, 530 F.2d 103, 106 (6th Cir.), cert. denied, 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976).
 Although the majority of circuit courts have, with comparatively little analysis, adopted the collective rights view, the Third and Tenth Circuits appear to have suggested the possible use of some form of intermediate model. In rejecting a criminal defendant's Second Amendment defense to a gun possession charge, the Tenth Circuit stated: "To apply the [Second] [A]mendment so as to guarantee appellant's right to keep an unregistered firearm which has not been shown to have any connection to the militia, merely because he is technically a member of the Kansas militia, would be unjustifiable in terms of either logic or policy." Oakes, 564 F.2d at 387. In Rybar, the Third Circuit concluded that: "Rybar [has not] establish[ed] that his firearm possession bears a reasonable relationship to `the preservation or efficiency of well-regulated militia.'" 103 F.3d at 286 (quoting Miller, 307 U.S. at 178, 59 S.Ct. 816).
 It appears that only the Second and District of Columbia Circuits have not taken a position, considered or otherwise, on the nature of the right established by the Second Amendment. See Fraternal Order of Police v. United States, 152 F.3d 998, 1002 (D.C.Cir.1998) ("Despite the intriguing questions raised, we will not attempt to resolve the status of the Second Amendment right....").
 
 
 [12]
 SinceHickman, we have cited its holding, with little discussion, in a few criminal cases in which the defendant raised a general Second Amendment defense to various firearms convictions along with other defenses that relate more specifically to the particular offenses alleged. See, e.g., United States v. Hinostroza, 297 F.3d 924 (9th Cir.2002); United States v. Mack, 164 F.3d 467, 474 (9th Cir. 1999); see also United States v. Hancock, 231 F.3d 557, 566 (9th Cir.2000) (holding that, because the Second Amendment does not create an individual right to arms, an equal protection challenge to a gun control law is reviewed "under the rational-basis standard."). In the present civil constitutional challenge to a gun control statute, unlike the criminal cases in which the Second Amendment was raised along with a number of more specific defenses, the question of the Second Amendment's scope is the principal issue before the court and has been thoroughly briefed and argued by the parties.
 
 
 [13]
 TheEmerson court examined the government's briefs in Miller, and observed that in that case the government made alternative arguments: first, that the Second Amendment does not establish an individual right to possess arms, and second, that the sawed-off shotgun at issue in Miller bore no reasonable relationship to militia service. 270 F.3d at 221-24. In the view of the Emerson court, the Supreme Court's opinion in Miller adopted the government's second argument, and not its first, which is not an unreasonable conclusion. That conclusion does not, however, lead to the result the Fifth Circuit then reaches. In our view, the government's second argument supports either the collective rights view or the limited individual rights view, but not the traditional individual rights doctrine that the Fifth Circuit adopts. Moreover, in an attempt to reconcile its position with Miller, the Fifth Circuit modifies that doctrine by asserting that certain undefined types of arms are excluded from the amendment's coverage. Miller suggests that the arms protected by the amendment, if any, are those related to militia service, but Emerson strays far from that view. While it is unclear precisely what types of arms the Fifth Circuit would deem included or excluded, Emerson's conclusion that the Second Amendment protects private gun ownership so long as the weapons have "legitimate use in the hands of private individuals," 270 F.3d at 223, represents a far different approach from that stated in Miller. In our view, the Fifth Circuit's decision is incompatible with the Supreme Court ruling.
 
 
 [14]
 See Opposition to Petition for Certiorari in United States v. Emerson, No. 01-8780, at 19 n. 3, available at http://www.usdoj.gov/osg/briefs/2001/Oresponses/2001-8780.resp.pdf.
 
 
 [15]
 If our review had led us to a conclusion contrary to that reached inHickman, we of course would not attempt to overrule that decision in this opinion. Instead, we would be required to call for en banc review. See Morton v. De Oliveira, 984 F.2d 289, 292 (9th Cir.1993) ("[O]nly the court sitting en banc may overrule a prior decision of the court."). Because we reaffirm Hickman here, however, an en banc call by the panel is not necessary.
 
 
 [16]
 AlthoughMiller is consistent with both the limited individual rights position and the collective rights view, for reasons we explain below we continue to adhere to the collective rights view we adopted in Hickman.
 
 
 [17]
 We concluded inHickman that because the individual plaintiff had no legally protectable interest under the Second Amendment, he lacked constitutional standing to bring a claim under that provision. Other courts have addressed Second Amendment claims on the merits, rather than under the rubric of standing doctrine. See, e.g., Gillespie, 185 F.3d at 710 (offering an informed discussion not only of the standing issue but also of some of the amendment's possible applications). Although in every case we are required to examine standing issues first, see, e.g., Scott v. Pasadena Unified School Dist., 306 F.3d 646, 653-54 (9th Cir.2002) ("We must establish jurisdiction before proceeding to the merits of the case."), here an examination of that question requires us as a first step to conduct a thorough analysis of the scope and purpose of the Second Amendment. Only after determining the amendment's scope and purpose can we answer the question whether individuals, specifically the plaintiffs here, have standing to sue. Thus, as a practical matter, the choice of jurisprudential approach makes little or no difference. Because we held in Hickman that the absence of an individually enforceable Second Amendment right resulted in a lack of standing, we follow our precedent and decide the case on that basis here.
 In Hickman, we did not rely on our earlier decision in Fresno Rifle & Pistol Club, Inc. v. Van De Kamp, 965 F.2d 723 (9th Cir.1992), that the Second Amendment is not incorporated by the Fourteenth and does not constrain actions by the states, although we noted in dictum that had standing existed, Fresno Rifle would be applicable. We undoubtedly followed that approach in Hickman because, as noted above, we must decide standing issues first. Fresno Rifle itself relied on United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876), and Presser v. Illinois, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), decided before the Supreme Court held that the Bill of Rights is incorporated by the Fourteenth Amendment's Due Process Clause. Following the now-rejected Barron v. Baltimore, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833) (holding that the Bill of Rights did not apply to the states), Cruikshank and Presser found that the Second Amendment restricted the activities of the federal government, but not those of the states. One point about which we are in agreement with the Fifth Circuit is that Cruikshank and Presser rest on a principle that is now thoroughly discredited. See Emerson, 270 F.3d at 221 n. 13. Because we decide this case on the threshold issue of standing, however, we need not consider the question whether the Second Amendment presently enjoins any action on the part of the states.
 
 
 [18]
 Our concurring colleague, Judge Magill, says that we should simply decide the case on standing as didHickman. That is precisely what we do. Hickman first examined the scope and purpose of the Second Amendment, and adopted one of the three principal theories regarding its meaning. It did so in order to resolve the standing question. In fact, it is impossible to decide standing without undertaking the type of analysis which our colleague wishes us to avoid. Only after determining that the collective view of the Second Amendment was correct was the Hickman court able to conclude that the individual plaintiff had no standing. We reach the same conclusion as to the collective view after conducting a similar analysis and, by virtue of doing so, we are also able to reach the same conclusion as to standing.
 The difference between our decision and Hickman is twofold. Since Hickman was decided, there have been extensive developments in the area of Second Amendment law. We take account of these developments and, after analyzing them, conclude that the result reached in Hickman does not change. Second, Hickman based its conclusion principally on a reading of Miller that appears to be incorrect: Miller neither adopts nor rejects the collective view. Because we believe Hickman reached the correct result on a significant constitutional issue currently being raised with some frequency in the district courts, we think it important to ground our circuit law on more solid constitutional reasoning and analysis. Given the plaintiffs' direct challenge to Hickman, the importance of the issue, and the extensive continuing judicial debate on the subject, it is, contrary to our colleague's view, in no way improper for us to reconsider Hickman in order to decide whether to (a) simply follow it without comment, (b) reaffirm it after considering intervening developments and engaging in a fuller constitutional analysis, or (c) request en banc review of the case before us.
 
 
 [19]
 Dorf,supra, at 294.
 
 
 [20]
 Stephen J. Heyman,Natural Rights and the Second Amendment, 76 CHI.-KENT L. REV. 237, 238 (2000).
 
 
 [21]
 L.A. Powe, Jr.,Guns, Words and Constitutional Interpretation, 38 WM. & MARY L. REV. 1311, 1360 (1997).
 
 
 [22]
 Even the learned Professor Tribe has appeared stymied by the task of construing the Second Amendment. In the first two editions of his treatise on constitutional law, he advocated the collective rights positionSee, e.g., LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 299 n. 6 (2d ed. 1988) ("[T]he sole concern of the [S]econd [A]mendment's framers was to prevent such federal interferences with the state militia as would permit the establishment of a standing national army and the consequent destruction of local autonomy. Thus the inapplicability of the[S]econd [A]mendment to purely private conduct ... comports with the narrowly limited aim of the amendment as merely ancillary to other constitutional guarantees of state sovereignty."). However, in the treatise's third edition Professor Tribe tentatively concluded that the amendment provides "a right (admittedly of uncertain scope) on the part of individuals," although he left unresolved many of the more difficult questions regarding the amendment's practical effect, concluding unhelpfully that "the Second Amendment provides fertile ground in which to till the soil of federalism and to unearth its relationship with individual as well as collective notions of rights." LAURENCE H. TRIBE, 1 AMERICAN CONSTITUTIONAL LAW 902 n. 221 (Foundation Press, 3d ed.2000). Soon after the third edition of the treatise was sent to press, Professor Tribe, in concert with another equally puzzled law school professor, appeared to equivocate even further regarding the scope of the amendment's protections. The two professors abandoned constitutional analysis almost entirely and retreated to a wholly pragmatic and political, though overly optimistic, discussion of how the two sides to the bitter Second Amendment debate could live happily ever after by reaching reasonable practical accommodations of their sharply conflicting constitutional views. Laurence H. Tribe & Akhil Reed Amar, Well-Regulated Militias, and More, N.Y. TIMES, Oct. 28, 1999, at A31.
 
 
 [23]
 Professor Levinson is of the view that another constitutional provision includes a similar type of preamble. He argues that the Copyright and Patent Clause, which states that Congress has the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries," U.S. CONST. art. I, § 8, has a structure analogous to that of the Second AmendmentSee Levinson, supra. In our view, this is highly doubtful; the first phrase of the Copyright and Patent Clause appears to set forth the substantive power granted to Congress, not the limitation on such a power.
 
 
 [24]
 Other advocates of the traditional individual rights model appear to read the first clause out of the amendment altogetherSee Volokh, supra, at 807-09; see also Powe, Jr., supra, at 1336 ("[T]o some, like the National Rifle Association, the preface bears so little relevance to the right that the preface might as well have been written in invisible ink.") For instance, in an article that has attracted much comment, Professor Volokh points out that although prefatory clauses like that included in the Second Amendment are not found elsewhere in the federal constitutional text, they are commonplace in state constitutions. On the basis of the limited significance of the prefatory clauses in the state constitutions, the able professor maintains that the prefatory clause in the Second Amendment should not be read as restricting the right established in the operative clause. Volokh, supra, at 807-09. However, this interpretation results in the denial of any significance at all to the first part of the amendment, in violation of the well-established canon of interpretation that requires a court, wherever possible, to give force to each word in every statutory (or constitutional) provision. United States v. Menasche, 348 U.S. 528, 538-539, 75 S.Ct. 513, 99 L.Ed. 615 (1955); see Marbury v. Madison, 5 U.S. (1 Cranch.) 137, 174, 2 L.Ed. 60 (1803). Moreover, as Professor Dorf, a leading exponent of the collective rights view, notes, the fact that preambles are common in state constitutions does not alter the fact that they are entirely atypical in the federal constitution. To the contrary, Professor Dorf says, the first clause of the Second Amendment ought to be attributed substantial weight, in part because it is so unusual. Dorf, supra, at 301. We find Professor Dorf's argument the more persuasive.
 
 
 [25]
 Specifically, inUnited States v. Verdugo-Urquidez, the Court stated that the use of the word "people" should have the same meaning in the Second Amendment as it does throughout the Constitution:
 "[T]he people" seems to have been a term of art employed in select parts of the Constitution. The Preamble declares that the Constitution is ordained and established by "the People of the United States." The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people." While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.
 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (citations omitted).
 We note that James Madison, no minor authority on the constitutional text, noted the arbitrariness of this interpretive approach. In doing so, in Federalist 37, he observed, "no language is so copious as to supply words and phrases for every complex idea, or so correct as not to include many equivocally different ideas." THE FEDERALIST NO. 37, at 197 (Clinton Rossiter, ed., 1961). Nevertheless, we are bound by the views of the Supreme Court.
 
 
 [26]
 U.S. CONST. art. I, § 8, cls. 12-14 (granting the power "To raise and support Armies," "To provide and maintain a Navy," and "To make Rules for the Government and Regulation of the land and naval Forces.")
 
 
 [27]
 Professor Jack Rakove, an eminent historian, in criticizing the logic underlying the traditional individual rights position, observes that "`[p]eople' is routinely defined [by advocates of the traditional individual rights position] intratextually, by reference to use in other amendments, but `militia' leaps beyond the proverbial four corners of the document, and is parsed [by those advocates] in terms of a historically contingent definition of what the militia has been and must presumably evermore be." Rakove,supra, at 124.
 
 
 [28]
 TheEmerson court points to a few uses of the phrase "bear arms" that do not refer to military service, primarily in the Report of the Pennsylvania Minority, prepared by those members of the Pennsylvania Ratifying Convention who dissented from that state's decision to ratify the Constitution. The Pennsylvania minority report is one of the few contemporaneous documents to refer to a private right to arms. However, its view was doubly rejected: first, by the Pennsylvania convention, which chose not to recommend to the new Congress any amendment related to the regulation of arms, and second, by the First Congress, which adopted the Second Amendment rather than the individual rights proposal of the Pennsylvania minority.
 
 
 [29]
 For instance, the Declaration of Independence cites as a grievance against the British Crown the fact that Great Britain impressed into the British Navy Americans captured on the high seas, and forced the prisoners to "bear arms" against their countrymen. THE DECLARATION OF INDEPENDENCE para. 28 (U.S.1776). The Continental Congress frequently used the term when permitting prisoners of war to be released to Britain, conditioning their release on the prisoners' "parole not to bear arms against the United States or their allies during the war." 14 JOURNALS OF THE CONTINENTAL CONGRESS 826 (July 14, 1779). Similarly, in giving instruction to General Washington to conduct an exchange of prisoners of war with Britain, Congress instructed that the exchanged prisoners be prohibited from active service in the military: "That hostages be mutually given as a security that the Convention troops and those received in exchange for them do not bear arms prior to the first day of May next." 18 JOURNALS OF THE CONTINENTAL CONGRESS 1030 (Nov. 17, 1780)
 
 
 [30]
 The Fifth Circuit dismisses theAymette decision because it believed that the constitutional provision relied on by the Tennessee court granted free white men the right to "keep and bear arms for their common defense." According to the Emerson court, the "common defense" language, which is not present in the Second Amendment, rendered the interpretation of the Aymette court inapplicable here. However, the Tennessee court reached its conclusion primarily because of a different provision of the state constitution that did not include the "common defense" language. Thus, the Fifth Circuit's attempt to distinguish Aymette fails.
 
 
 [31]
 The use of "bear arms" in Madison's proposal for a conscientious objector proposal is identical to its use in a number of suggested amendments offered by the state ratifying conventions. In Virginia, for example, George Wythe suggested a proposed constitutional amendment that, like Madison's first draft of the Second Amendment, quite evidently uses "bear arms" to mean military service: "That any person religiously scrupulous of bearing arms ought to be exempted, upon payment of an equivalent to employ another to bear arms in his stead." 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 659 (Jonathan Elliott ed., 2d ed. 1866) [hereinafter DEBATES];see also 1 DEBATES, supra, at 335 (Rhode Island Ratifying Convention Proposed Amendments) ("That any person religiously scrupulous of bearing arms ought to be exempted upon payment of an equivalent to employ another to bear arms in his stead.").
 
 
 [32]
 As Professor John Hart Ely has observed, "here, as almost nowhere else, the framers and ratifiers apparently opted against leaving to the future the attribution of purposes, choosing instead explicitly to legislate the goal in terms of which the provision was to be interpreted." JOHN HART ELY, DEMOCRACY AND DISTRUST 95 (1980)
 
 
 [33]
 As we have noted,supra p. 14, the Miller Court stated: "With the obvious purpose to assure the continuation and render possible the effectiveness of [state militias] the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view." 307 U.S. at 178, 59 S.Ct. 816 (emphasis added).
 
 
 [34]
 The Third Amendment states: "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in manner prescribed by law."
 
 
 [35]
 A number of early state constitutions included provisions prohibiting the maintenance of standing armies by the executive branch. The Massachusetts provision is typical: "And as in time of peace armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and the military power shall always be held in exact subordination to the civil authority, and be governed by it." MASS. CONST. pt. I, art. XVII (1780),in BILL OF RIGHTS, supra, at 183. See also DELAWARE DECLARATION OF RIGHTS, § 19 (1776) ("That standing armies are dangerous to liberty, and ought not to be raised or kept up without the consent of the Legislature."), in BILL OF RIGHTS, supra, at 183.
 
 
 [36]
 Some states, particularly during the Articles of Confederation period, in turn required individual militiamen to bring their own arms for militia service. SeeMiller, 307 U.S. at 180-82, 59 S.Ct. 816 (citing statutes). As we observed in Hickman, however, "in practice, the command" that militiamen arm themselves "was ignored." 81 F.3d at 103 n. 8. In many other states, both the official and the actual responsibility for arming the militia rested, as the Articles of Confederation contemplated, with the state governments. The Georgia statute was typical; the state was required to "Arm and Array the militia for suppressing all such insurrections, as may happen." Act of 1778, in 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: STATUTES COLONIAL AND REVOLUTIONARY, 1774 to 1805, at 104 (1970). Regardless of where the official responsibility rested, however, the comments of Madison, Randolph, and others, made at the Constitutional Convention, cited infra, reflect the common understanding that the state militias were ill-equipped.
 
 
 [37]
 During the period that the Articles were in effect, both George Washington and Henry Knox, who was to become the nation's first Secretary of War in the Washington Administration, urged the creation of a standing national military force, to no avail. H. Richard Uviller & William G. Merkel,The Second Amendment in Context: The Case of the Vanishing Predicate, 76 CHI.-KENT L. REV. 403, 411-13 (2000). Washington in particular felt that the need was acute; in 1783 he wrote a document entitled Sentiments On A Peace Establishment, in which he recommended establishing a national militia that would exist along with those maintained by the individual states. Subsequently, he wrote to John Adams in the wake of Shays's Rebellion that because of the lack of a unified national military force, "[w]e are fast verging to anarchy and confusion!" Letter from George Washington to James Madison (Nov. 5, 1786), in 29 THE WRITINGS OF GEORGE WASHINGTON, 1745-1799, at 51 (John Clement Fitzpatrick ed., 1931).
 
 
 [38]
 See also 2 DEBATES, supra, at 387 (Virginia Ratifying Convention) ("Have we not found from experience, that, while the power of arming and governing has been solely vested in the state legislatures, they were neglected and rendered unfit for immediate service?") (Statement of James Madison).
 
 
 [39]
 We use the terms "Federalist" and "Anti Federalist" as they were originally intended and as they plainly read, as opposed to the current paradoxical distortions of the terms. For some inexplicable reason, the term "Federalist" is currently used to refer to those who favor devolving fundamentally national functions upon the individual states, rather than to those who favor granting to the national government the powers necessary to operate effectively and to promote the social compact that underlies American democracy
 
 
 [40]
 See 3 DEBATES, supra, at 392 ("If you give [the power to federalize the militia] not to Congress, it may be denied by the states. If you withhold it, you render a standing army absolutely necessary; for if they have not the militia, they must have such a body of troops as will be necessary for the general defence of the Union.") (statement of George Nicholas at the Virginia Ratifying Convention).
 
 
 [41]
 Advocates of the traditional individual rights view often quote Madison's observation that the American people have the "advantage of being armed" as conclusive evidence that the Founders intended to protect the personal ownership of firearmsSee, e.g., Emerson, 270 F.3d at 249 n. 3; Don B. Kates, Jr., Gun Control: Separating Reality From Symbolism, 20 J. CONTEMP. L. 353, 364 (1994). However, examination of those words in context, as set forth above, suggests that Madison was referring to armed citizens in the service of state governments, i.e., militiamen.
 
 
 [42]
 This was in Madison's early period, when he was an ally of Hamilton's; it was not until later that he joined Jefferson in organizing the political faction that became the Republican Party and opposed the policies of the Federalists, including President Washington and, more openly, those of President John AdamsSee DAVID MCCULLOUGH, JOHN ADAMS 436, 475 (2001).
 
 
 [43]
 The text of Article I does not state that Congress hasexclusive power to arm the militia. The language indicates that the grant of power is permissive: Congress "may" arm the militia. Nothing in the Article or elsewhere in the Constitution appears to bar the states from choosing to arm their respective militias as they wish. Nevertheless, most prominent Anti-Federalists — whether motivated by sincere belief or by a desire to engage in the rhetoric at which they excelled — complained that the Militia Clauses were a dangerous extension of exclusive federal power. For instance, in a published exchange of letters with Federalist Oliver Ellsworth of Connecticut, prominent Anti-Federalist Luther Martin of Maryland complained that the federal government has "the powers by which only the militia can be organized and armed, and by the neglect of which they may be rendered utterly useless and insignificant." 3 CONVENTION RECORDS, supra, at 285.
 
 
 [44]
 The Civil War and its consequences, including the adoption of the Fourteenth Amendment, appear to have settled a number of the theoretical issues that caused the Anti Federalists such concern; the question of a national as opposed to state-by-state military defense force would also seem somewhat academic after World War I, World War II, the Cold War, and Al Qaeda
 
 
 [45]
 None of the major proposals for a Bill of Rights included any provision affording individuals such a right. For instance, two of the more prominent Anti-Federalist critics of the proposed constitution, Mason and Richard Henry Lee, both of Virginia, published highly influential objections to the new Constitution. However, although these two statesmen "articulated nearly all the major principles that would eventually be written into the Bill of Rights, [they] made no claim for a purely private right to arms." Uviller & Merkel,supra, at 482. Similarly, Thomas Jefferson, who was in France during the ratification period, suggested a number of changes to the new Constitution in a letter to Madison; although protection against standing armies was among his proposals, an individual right to possess arms was not. Letter from Thomas Jefferson to James Madison (Dec. 20, 1787), quoted in Uviller & Merkel, supra, at 494.
 
 
 [46]
 See The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to Their Constituents, 3 THE COMPLETE ANTI-FEDERALIST 151 (Herbert J. Storing, ed., 1981).
 
 
 [47]
 The Pennsylvania minority, so frequently cited by the proponents of the individual rights view, also used language markedly different from that of the Second Amendment. Its proposal for a federal constitutional amendment, which was rejected in favor of the Second Amendment, would have unambiguously established a personal right to possess arms for personal purposes: "[N]o law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals...."The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, at 623-24 (quoted in Finkelman, supra, at 208).
 
 
 [48]
 One other proposal for an amendment establishing an individual right to possess arms might be considered, at most, moderately significant, if only because it was advanced by prominent Massachusetts Anti-Federalist and revolutionary leader Samuel Adams. The proposal failed to attract the support of many Massachusetts delegates, and is included in the Report of the Minority which was issued at the conclusion of that state's ratifying convention. Report of the Massachusetts Minority, Feb. 6, 1788,in BILL OF RIGHTS, supra, at 181.
 
 
 [49]
 Professor Rakove takes traditional individual rights advocates to task in regard to their contrary analysis of the ratification process: "If Americans had indeed been concerned with the impact of the constitution on [the private right to arms], and addressed the subject directly, the proponents of the individual right theory would not have to recycle the same handful of references to the dissenters in the Pennsylvania Ratification Convention and the protests of several Massachusetts members against their state's proposed constitution, or to rip promising snippets of quotations from the texts and speeches in which they are embedded." Rakove,supra, at 109.
 
 
 [50]
 For instance, Madison resisted Anti-Federalist proposals to place limits on the national army, as well as on the authority of the federal government to call the state militia into federal service. Various amendments related to the national army had been offered, such as to restrict the standing army in peacetime, to require a supermajority for congressional authorizations regarding the federal army, or to impose a numeric limit on the size of any federal armySee Yassky, supra, at 607. Madison rejected all of them. Anti-Federalists offered dire predictions, particularly regarding the federal power to call forth state militias. They predicted that this power would lead to one state's militia being turned against another's, and that the federal government would force state militias to march to far-flung corners of the nation. Id.
 
 
 [51]
 We differ with the Fifth Circuit's reading of the historical record in this respect. TheEmerson court cites a number of general statements, both in the congressional record and outside of it, by "prominent Americans" that the first twelve proposed amendments, ten of which were ratified as the Bill of Rights, relate to individual rights. 270 F.3d at 245-55. It is of course true that the amendments primarily establish individual rights; however, it cannot be disputed that certain portions of the proposed amendments related to other matters. The Tenth Amendment, for instance, relates primarily to the balance of power between the state and federal governments. Additionally, the provision that was recently ratified as the Twenty-Seventh Amendment, but was originally promulgated with the original twelve amendments, relates to Congressional compensation, not individual rights. Thus, we find unconvincing the argument that because some legislators and public figures generally discussed the group of proposed amendments, as establishing individual rights, the Second Amendment establishes a private right to own or possess firearms.
 
 
 [52]
 Comments of individual delegates also reveal that those who supported the Second Amendment did so because they sought to protect the people from federal hegemony. For instance, Anti-Federalist Elbridge Gerry of Massachusetts sought elimination of the conscientious objector provision because he was concerned that if it were included in the federal constitution, then Congress, rather than the state legislatures, would define what constituted conscientious objection, and that Congress would thereby have excessive authority over the management of the state militia. Gerry concluded, "if we give a discretionary power[to the federal government] to exclude those from militia duty who have religious scruples, we may as well make no provision on this head." BILL OF RIGHTS,supra, at 185. Thus, in Gerry's view, if Congress, through the conscientious objector provision, could control membership in the militia, then there was little point to the Second Amendment at all. Id.
 
 
 [53]
 Plaintiffs have standing to bring these claims because they allege that the challenged provisions to the AWCA afford a benefit to some persons and not to others based on grounds that cannot survive Equal Protection scrutiny. If their arguments are correct, plaintiffs would suffer an equal protection injury. As the Supreme Court has explained:
 When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.
 Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).
 
 
 [54]
 One could question the wisdom of arming certain government officials categorized as "peace officers" by the AWCA — particularly park rangers and employees of the district attorney's office — with high-powered military-style weapons. However, that is not the basis for plaintiffs' challenge to this provision of the AWCA. The question is whether those officers furnished such weapons may use them for law enforcement purposes when off duty. As set forth in the text, inclusion of the limitation that the assault weapons are to be used for law enforcement purposes only renders the provision a rational one
 
 
 [55]
 It would appear from the wording of § 12285 that retired peace officers who obtain assault weapons for personal use upon retirement from government service are exempt from the registration and use restrictions of the AWCA. Whether or not they are, however, our conclusion is the same
 
 
 [56]
 California Governor Gray Davis, who signed the 1999 amendments to the AWCA including the retired officer exception, evinced a similar intent through his public statements. In announcing, with great fanfare, his support for the 1999 amendments to the AWCA, he proclaimed that "[t]here is no justification whatsoever for [assault weapons] on the streets of a civilized society." Martha L. Willman,Davis Backs Bill to Limit Assault Gun Sale and Use Legislation, L.A. TIMES, Apr. 27, 1999, at B2.
 
 
 [57]
 While the grandfather clause may also appear to be inconsistent with this legislative intent, that clause is not challenged here. Equally important, the argument that a rational basis for the grandfather clause exists is entirely different from, and likely more substantial than, those put forward to justify the off-duty exception
 
 
 [58]
 We need not consider here whether any officers who may have purchased weapons prior to the adoption of the AWCA are covered by its grandfather clause. That issue is not before us
 
 
 
 114
 MAGILL, Circuit Judge, Special Concurrence.
 
 
 115
 I join parts I, II-C, and III of the court's opinion. Respectfully, I cannot join parts II-A and II-B, but I do concur in the judgment. Parts II-A and II-B consist of a long analysis involving the merits of the Second Amendment claims and the Ninth Circuit's adoption of the collective rights theory of the Second Amendment. As discussed below, this analysis seems unnecessary.
 
 
 116
 Article III of the Constitution requires that federal courts adjudicate only actual "cases" or "controversies." E.g., Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). This requirement "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." Id. Among the doctrines that ensure federal courts only resolve "cases" or "controversies," Article III standing "is perhaps the most important." Id. The requirement of Article III standing "aids the federal judiciary to avoid intruding impermissibly upon the powers vested in the executive and legislative branches, by preventing courts from issuing advisory opinions not founded upon the facts of a controversy between truly adverse parties." Scott v. Pasadena Unified Sch. Dist., 306 F.3d 646, 654 (9th Cir.2002) (citing United Pub. Workers v. Mitchell, 330 U.S. 75, 89-90, 67 S.Ct. 556, 91 L.Ed. 754 (1947)). "Article III standing is a jurisdictional prerequisite." Hickman v. Block, 81 F.3d 98, 101 (9th Cir.1996). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868).
 
 
 117
 It is well established that, as a threshold matter, this court must determine whether the plaintiffs have standing to assert their claim. E.g., Scott, 306 F.3d at 653-54 (stating that "[w]e must establish jurisdiction before proceeding to the merits of the case"); Bird v. Lewis & Clark Coll., 303 F.3d 1015, 1019 (9th Cir.2002) (recognizing that before reaching the merits of the case, the court must determine the threshold issue of standing); Hickman, 81 F.3d at 101 (discussing that the court is "bound to address the standing issue at the threshold of the case"). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of the particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The plaintiffs in this case are simply not entitled to standing and thus I cannot join the court's discussion of the merits of their Second Amendment claims.
 
 
 118
 Here, the court claims that "[a]lthough in every case we are required to examine standing issues first, ... here an examination of that question requires us as a first step to conduct a thorough analysis of the scope and purpose of the Second Amendment. Only after determining the amendment's scope and purpose can we answer the question whether individuals, specifically the plaintiffs here, have standing to sue." Maj. Op. at 1066-67 n. 17 (internal citation omitted). Respectfully, I disagree. Previously, this court decided the scope and purpose of the Second Amendment. We are bound by that precedent.
 
 
 119
 In Hickman, this court announced that the Second Amendment guarantees a collective right, not an individual right. 81 F.3d at 102. As such, this court held that an individual plaintiff lacks standing to enforce the right to keep and bear arms because "the states alone stand in the position to show legal injury when this right is infringed." Id. As recognized by my colleague Judge Reinhardt, we have no power to overrule Hickman; only an en banc panel may do so. See Maj. Op. at 1066 n. 15 (citing Morton v. De Oliveira, 984 F.2d 289, 292 (9th Cir.1993)). Thus, we are bound by the Hickman decision, and resolution of the Second Amendment issue before the court today is simple: plaintiffs lack standing to sue for Second Amendment violations because the Second Amendment guarantees a collective, not an individual, right and thus plaintiffs are unable to establish injury in fact. See Scott, 306 F.3d at 654 ("In order to establish standing, a plaintiff must first show that she has suffered an `injury in fact.'" (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted))). Precedent mandates that we affirm the district court's dismissal of these claims for lack of standing. Accordingly, it is unnecessary and improper to reach the merits of the Second Amendment claims or to explore the contours of the Second Amendment debate.
 
 
 120
 Consequently, I join parts I, II C, and III of the court's opinion and concur in its judgment that plaintiffs lack standing to challenge the AWCA.